███████████████

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

| | |
|---|---|
| BLUE CROSS BLUE SHIELD OF TEXAS, A DIVISION OF HEALTH CARE SERVICE CORPORATION, A MUTUAL LEGAL RESERVE COMPANY | Case No. |
| *Plaintiff*, | |
| vs. | **COMPLAINT** |
| HALOMD, LLC, ALLA LAROQUE, and SCOTT LAROQUE | |
| *Defendants*. | |

Plaintiff Blue Cross Blue Shield of Texas, a division of Health Care Service Corporation, a mutual legal reserve company ("BCBSTX"), brings this Complaint against Defendants HaloMD, LLC ("HaloMD"), Alla LaRoque, and Scott LaRoque (collectively, "Defendants") and alleges as follows:

## INTRODUCTION

1.     This case arises from the Defendants' abuse of federal and state legislation that was intended to shield patients from unexpected medical bills, reduce the overall cost of healthcare, and provide a fair process for determining *reasonable* out-of-network reimbursement to providers.

2.     The federal No Surprises Act ("NSA") and its Texas analogue, Texas Senate Bill 1264 ("SB 1264"), were enacted to protect patients from receiving surprise medical bills when they inadvertently receive care from out-of-network providers. The statutes were also intended to provide a less-costly means to resolve disputes between providers and health plans over out-of-network reimbursement for certain services. Specifically, both the NSA and SB 1264 established

███████████████

mechanisms—called "IDR Processes"—intended to efficiently resolve out-of-network disputes and *decrease* aggregate healthcare costs.[1]

3.    These IDR Processes have not worked as intended. Congress directed that average in-network rates operate as a key benchmark for IDR Processes (defined by the NSA as the Qualified Payment Amount ("QPA")). But instead, the IDR Processes often result in awards that are many multiples of the median rates that in-network providers receive—and sometimes even greater than the provider's own billed charge for the disputed services. Likewise, despite clear limitations on the types of out-of-network services that are subject to these IDR Processes, hundreds of millions (if not billions) of dollars in awards have been issued on *ineligible* services.

4.    Defendants—and a handful of other private-equity backed middlemen—are driving this outcome by abusing the IDR Processes. In the present case, Defendants have repeatedly defrauded BCBSTX, as well as the entities that oversee the federal and state IDR Processes, by initiating hundreds of thousands of disputes that the Defendants knew or should have known were ineligible for those respective IDR Processes. Upon information and belief, Defendants did so because they knew their actions and the statutory schemes they were abusing would deprive BCBSTX of any real opportunity to challenge eligibility.

5.    This case concerns fraudulent submissions made by HaloMD, a medical billing company, in the NSA ("Federal") and SB 1264 ("Texas") IDR Processes.

6.    HaloMD was started in 2022 by Alla LaRoque. Her husband, Scott LaRoque, is on HaloMD's Board of Directors and runs a related company, MPOWERHealth.

---

[1] *See* Office of Health Policy, Issue Brief, *Evidence on Surprise Billing: Protecting Consumers with the No Surprises Act*, (November 22, 2021), Available at: https://aspe.hhs.gov/sites/default/files/documents/acfa063998d25b3b4eb82ae159163575/no-surprises-act-brief.pdf.

7.      HaloMD touts itself as a leading expert in the NSA, specializing in "Independent Dispute Resolution (IDR) and Medical Provider Revenue Optimization." It advertises that it obtains awards eight times higher than the QPA and has won over $2 billion in annual award determinations.[2] HaloMD is also incentivized to juice the IDR Processes: it takes a percentage of any award issued to its healthcare provider clients.

8.      In just two years, HaloMD has become one of the highest submitters of Federal IDR disputes nationwide—submitting over 10% of all Federal IDR disputes across the country.

9.      HaloMD submits tens of thousands of ineligible services to the IDR Processes each year. HaloMD knows or should know that these services are ineligible, but for each of these ineligible disputes it submits to the IDR Processes, it falsely certifies the services are eligible for IDR.

10.      For example, HaloMD initiated more than 5,400 overlapping IDR proceedings *for the same services* under both the federal and Texas IDR Processes, even though the two IDR Processes' eligibility requirements are mutually exclusive. Put another way, HaloMD sought (and often received) duplicate payments for the same services, in two different IDR Processes, despite eligibility for one IDR Process rendering the service ineligible for the other. HaloMD cannot honestly attest to the eligibility of the same disputed claims and services in both venues.

11.      As another example, the federal IDR Process has strict timing requirements, including that an "open negotiations period" must be initiated by a provider within 30 days of payment for a given item or service and the formal IDR Process can only be initiated within four days after an initial open negotiation period lapses. HaloMD consistently and intentionally initiates formal IDR proceedings outside the timeframe allowed by statute. For instance, HaloMD procured

---

[2] *See* HaloMD, *Industry Leading Results*, Available at: https://halomd.com/.

awards in over 34,000 IDR Processes initiated more than 50 days after the deadline to do so under the NSA—21,000 of those awards come from IDR Processes initiated over 100 days after the deadline, and 7,900 of those awards result from IDR Processes initiated more than 200 days after the deadline.

12.    HaloMD has wrongly obtained awards in excess of well over $100 million from BCBSTX and its plan sponsors by initiating tens of thousands of IDR Proceedings for ineligible items, services, and claims. In addition, HaloMD's improper submissions have caused BCBSTX to incur more than $30 million in administrative fees, and additional administrative and staffing expenses, all of which continue to accrue due to HaloMD's continued improper submissions.

13.    BCBSTX now brings this action to bar HaloMD from continuing to submit ineligible claims into the federal and Texas IDR Processes and to recover its damages.

## THE PARTIES

14.    Plaintiff BCBSTX is an unincorporated division of Health Care Service Corporation, a mutual legal reserve company incorporated in Illinois, with its principal place of business in Illinois. BCBSTX offers a full spectrum of insured health care plans and administrative services for government and employer-sponsored self-funded health plans, serving over 8 million members in Texas and with members in all 254 counties.

15.    Defendant HaloMD, LLC is a limited liability company incorporated in the state of Delaware and with a principal place of business at 5080 Spectrum Drive Ste 1100 E Addison, Texas. According to filings with the Texas Secretary of State, HaloMD has two members. The first member of HaloMD is LFF Holdings Groups Ltd Co ("LFF"). LFF is a Texas limited liability company with Scott LaRoque as its sole member. The second member of HaloMD is Scalla Investments, L.L.C. ("Scalla Investments"). Scalla Investments is a Texas limited liability

company with Scott LaRoque and Alla LaRoque as its sole members. Accordingly, for purposes of diversity, Defendant HaloMD is a citizen of Texas.

16.    Defendant Alla Vilgelm LaRoque is a natural person, domiciled in Austin, Texas, who is the President and beneficial owner of HaloMD.

17.    Defendant Scott Lance LaRoque is a natural person, domiciled in Austin, Texas, who is a beneficial owner of HaloMD and on its Board of Directors.

## JURISDICTION AND VENUE

18.    This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C § 1332 because there is complete diversity amongst the plaintiff and defendant, and the amount in controversy exceeds $75,000.

19.    Plaintiff is a mutual legal reserve company incorporated in Illinois and with its principal place of business in Illinois.

20.    Defendant Alla LaRoque is domiciled in Austin, Texas.

21.    Defendant Scott LaRoque is domiciled in Austin, Texas.

22.    Defendant HaloMD, LLC is a limited liability company incorporated in the state of Delaware with a principal place in Texas. According to filings with the Texas Secretary of State, HaloMD has two members. The first member of HaloMD is LFF Holdings Groups Ltd Co ("LFF"). LFF is a Texas limited liability company with Scott LaRoque as its sole member. The second member of HaloMD is Scalla Investments, L.L.C. ("Scalla Investments"). Scalla Investments is a Texas limited liability company with Scott LaRoque and Alla LaRoque as its sole members. Accordingly, for purposes of diversity, Defendant HaloMD is a citizen of Texas.

23.    This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because it arises under federal law. Specifically, BCBSTX asserts claims under The Racketeer

Influenced and Corrupt Organizations ("RICO") Act, *see* 18 U.S.C. §1961, *et seq.*; *see also* 18 U.S.C. §1964(a) ("The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter…"). The Court has subject-matter jurisdiction over BCBSTX's other claims under 28 U.S.C. § 1367, as those claims are so related to BCBSTX's federal statutory causes of action that they form part of the same case or controversy.

24.    This Court has general and specific jurisdiction over HaloMD because HaloMD's principal place of business is in Texas and because HaloMD systematically and continuously conducts business in Texas, including committing the acts that give rise to this lawsuit. Specifically, upon information and belief, HaloMD devised, implemented, and carried out the scheme described herein from its principal place of business in Addison, Texas. Such acts were directed at BCBSTX, including its main Texas campus located in Richardson, Texas, in the Eastern District of Texas.

25.    Venue is proper in this District under 28 U.S.C. § 1391 because "a substantial part of the events giving rise to the claims in this action occurred in this District." 28 U.S.C. § 1391(b)(2). Specifically, HaloMD targeted BCBSTX, which has its main Texas campus in this District. In addition, medical services were reportedly rendered to BCBSTX's members in this District (among other places), and HaloMD improperly initiated IDR Processes on behalf of providers located within this District. For example, services at issue in this case include those rendered to BCBSTX's members in and around Texarkana, Texas.

## BACKGROUND ON BALANCE BILLING

26.     Health benefit plans contract with healthcare providers, making the provider "participating" or "in-network" for that plan.

27.     Provider network contracts set forth, among other things, rates that the health benefit plan will reimburse the provider for covered services rendered by a member. These rates apply instead of the "billed charges" a provider might otherwise hold out as the price for its services.

28.     When a member receives covered healthcare from an in-network provider, the member is typically only responsible for the payment of a co-pay, deductible, and/or co-insurance. The in-network provider is also prohibited from seeking charges from the patient in excess of the rates agreed upon in the network agreement.

29.     On the other hand, if a provider is "out-of-network," they have no network agreement with the applicable health benefits plan. This means there is no agreed-upon rate for covered services rendered by an out-of-network provider to be reimbursed at, nor are there limits on what they may charge a patient for such services. Out-of-network providers often set rates that are entirely divorced from the cost-of-care and/or reasonable profitability.

30.     Out-of-network providers could historically "balance bill" patients for their excess charges above the plan's maximum allowed amount. And because providers set their rates unilaterally, the charges were often inflated, leading to massive balance bills. Providers that balance billed patients could impose a significant hardship on their patients, including bankruptcy.

31.     Balance bills became especially prevalent in instances where members could not choose to receive care from an in-network provider, such as emergency care. In other situations,

the member may have chosen a network facility, but certain providers staffing the facility—like anesthesiologists—were out-of-network and billed separately.

32.    In both instances, out-of-network providers could "surprise" patients with huge balance bills. These balance bills were also often inflated or were arbitrary amounts that had no relation to the cost of care, market rates, or any other measure of reasonable value for the services. And often, patients would have no idea they had received care from an out-of-network provider until they received a balance bill for thousands of dollars.

### THE FEDERAL NO SURPRISES ACT AND TEXAS SENATE BILL 1264

33.    To combat predatory balance billing, federal and state lawmakers passed two pieces of legislation relevant to this dispute: the federal NSA and Texas SB 1264.

***The No Surprises Act.***

34.    In 2020, Congress enacted the NSA in an attempt to end "surprise medical bills." Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758–2890 (2020).

35.    The NSA was designed to: (1) shield patients from unexpected out-of-network bills, and (2) establish a payment that is "fair to both providers and plans that also does not increase aggregate healthcare system costs."[3]

36.    The NSA established an IDR Process for resolving payment disputes on claims between out-of-network providers and health plans ("the Federal IDR"). *See* 42 U.S.C. § 300gg-111(c).

---

[3] Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services, *Evidence on Surprise Billing: Protecting Consumers with the No Surprises Act* (Issue    Brief    No.    HP-2021-24)    at    1,    5,    November    22,    2021, https://aspe.hhs.gov/sites/default/files/documents/acfa063998d25b3b4eb82ae159163575/no-surprises-act-brief.pdf.

37.    The Federal IDR Process has strict eligibility requirements, including but not limited to the following:

a.    *First*, Federal IDR is not available where a "specified state law" applies—*i.e.*, a state law that provides a method for determining the total amount payable to an out-of-network provider for covered services that otherwise fall within the scope of the NSA, 42 U.S.C. § 300gg-111(a)(3)(I), such as the plans described above to which SB 1264 applies.

b.    *Second*, the services and items at issue must be within the NSA's scope—meaning that the services must be rendered by an out-of-network provider rendering emergency services, non-emergency services at participating facilities, or air ambulance services. 42 U.S.C. § 300gg-111(c)(1)(B).

c.    *Third*, the services and items must not have been the subject of a previous award issued through the Federal IDR Process. 42 U.S.C. § 300gg-111(c)(1)(B).

d.    *Fourth*, a provider must initiate open negotiation via written notice as prescribed in the Provider Claim Summary, and to be timely, the provider must give this notice within 30 days of the health plan's first notice of payment or denial for the item or service. *See* 42 U.S.C. § 300gg-111(c)(1)(A).

e.    *Fifth*, once properly commenced, the provider must exhaust the 30-day open negotiation period. *See* 42 U.S.C. § 300gg-111(c)(1)(B).

f.    *Sixth*, if the provider wishes to proceed to formal IDR, the provider must initiate a formal IDR within four business days after exhaustion of the open negotiations period. 42 U.S.C. § 300gg-111(c)(1)(B).

38.    Generally, this process is a baseball style arbitration that works as follows:

a.      Within 30 days of initial payment or notice of denial on a claim, the provider must initiate by providing written notice and participate in "open negotiations" with the applicable health benefits plan. 42 U.S.C. § 300gg-111(c)(1)(B);

b.      If the provider exhausts the 30-day open negotiations period and the parties do not agree upon a payment amount, the provider can then initiate the formal IDR Process through an online portal within 4 days after the open negotiations period has lapsed. *Id*. at § 300gg-111(c)(1)(B);

c.      To initiate the formal IDR Process, the provider has to answer various questions in the online portal related to the medical services and claim being disputed, then complete a Notice of IDR Initiation Form;

d.      The parties then select, or have appointed, an Independent Dispute Resolution Entity ("IDRE"). 42 U.S.C. § 300gg-111(c)(4)(F);

e.      After determining that the Federal IDR Process applies, the provider and health plan each submit an offer to the IDRE. 42 U.S.C. § 300gg-111(c)(5)(B);

f.      The IDRE then selects one party's offer, taking into account the "qualifying payment amount" ("QPA"), which is the health benefit plan's median in-network rate for the same service, and other circumstances related to the provider and patient. 42 U.S.C. § 300gg-111(c)(5)(C);

g.      This decision is then binding upon the parties, subject to limited judicial review, and the non-prevailing party is responsible for administrative and IDRE fees. 42 U.S.C. § 300gg-111(c)(5)(F).

39.     The Federal IDR Process is costly. As mentioned, the IDREs that oversee this Process charge administrative fees, which are the responsibility of the party that loses the dispute.

42 U.S.C. § 300gg-111(c)(5)(F)(i). Often these administrative fees exceed the value of the underlying reimbursement dispute.

40.     To avoid the filing of ineligible disputes under the Federal IDR Process, providers are required to provide information and attest that the service meets eligibility requirements when initiating a dispute.

41.     As outlined below, it is nearly impossible to "accidentally" submit an ineligible claim to the Federal IDR Process.

42.     Once the open negotiation period discussed above has been exhausted, the process of initiating a dispute under the Federal IDR begins with providers having to input information into an online portal created by the U.S. Department of Health & Human Services (HHS).[4]

43.     The portal's first page confirms a party initiating IDR must provide an "[a]ttestation that qualified IDR items or services are within the scope of the Federal IDR process":[5]

---

[4] *See* Department of Health & Human Services, *Notice of IDR Initiation*, Available at: https://nsa-idr.cms.gov/paymentdisputes/s/.
[5] 45 C.F.R. § 149.510(b)(2)(iii)(A)(6).



44.     Next, the provider must select the "Health Plan Type" from enumerated dropdown options, which are limited to only those types of plans that are potentially eligible for the Federal IDR Process:



45.    In response to some selections, including for the selection of a certain type of benefits plan, the portal returns an alert about ineligibility; for instance:



⚠ This dispute is not eligible for the federal IDR process because the date of service you provided is before 1/1/2022.

46.    The last step in the Process is submission of the Notice of IDR Initiation form,[6] which contains information proscribed by HHS.

47.    Among other things, this form includes fields for the provider to complete, including information regarding the "Qualified IDR Item(s) or Service(s)":

**[INFORMATION TO BE COMPLETED BY THE INITIATING PARTY]**

1.  **Initiating party is (check one):**   ☐ Plan ☐ Issuer ☐ FEHB Carrier ☐ Health care provider
☐ Health care Facility ☐ Provider of air ambulance services

2.  **Qualified IDR Item(s) or Service(s)** [insert additional rows as appropriate]

| | Description of qualified IDR item(s) or service(s) | Claim Number | Batched (Y/N) | Date of item(s) or service(s) | Location where item(s) or service(s) were furnished (include state) | Service code(s) | Place-of-service code(s) | Type of qualified item(s) or service(s) | Qualifying Payment Amount | Cost Sharing Amount Allowed | Initial Payment Amount for the item(s) or service(s), if applicable |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |
| 5. | | | | | | | | | | | |

48.    The form also requires the provider to supply the "Name of the Plan/Issuer/Carrier" and to select the "Type of Plan" from an enumerated list:

---

[6] Departments of the Treasury, Labor, and Health and Human Services (Departments) and the Office of Personnel Management, *Notice of IDR Initiation Instructions*, OMB Control No. 1210-0169, Available at: https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/no-surprises-act/notice-of-idr-initiation.pdf.

---

**3. Group Health Plan/Health Insurance Issuer/FEHB Carrier Information**

Name of Plan/Issuer/Carrier: _____

Type of Plan (select one):

    ☐ Federal Employees Health Benefits (FEHB) plan:

         If FEHB plan, enter 3-digit Enrollment Code: _____

    ☐ Individual health insurance plan

    ☐ Non-federal governmental plan (i.e., state and local government plan)

    ☐ Church plan

    ☐ Private employment-based group health plan (i.e., an ERISA plan)

         If ERISA plan, is the ERISA plan self-insured? Y/N _____

    ☐ Unknown

**Contact Information**

---

49.     The provider must also include the date it commenced the open negation period:

---

**5. Indicate the commencement date of the open negotiation period:**

_____

---

50.     Finally, the provider must sign and date an "**ATTESTATION**" that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process":

---

**8. ATTESTATION:**

___ I, the undersigned initiating party (or representative of the initiating party), attests that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.

Initiating Party (or Representative of the Initiating Party): _____

Print Name: _____     Date: _____

---

███████████████

*Texas Senate Bill 1264*.

51.     Similarly, in 2019, the Texas Legislature passed SB 1264, which was intended to "prohibit[] all non-network ... providers from sending surprise balance bills to consumers."[7]

52.     SB 1264 applies to claims for benefits under Texas fully insured health maintenance organizations ("HMO"), exclusive provider organizations ("EPO"), and preferred provider organizations ("PPO") for services rendered by an emergency care provider, an out-of-network provider rendering services in an in-network facility, an out-of-network laboratory service, or an out-of-network diagnostic imaging service. *See* Tex. Ins. Code §§ 147.002 & 1467.084(a)(2)(A)-(D).

53.     SB 1264 also implemented an "Out–of–Network Claim Dispute Resolution" process (herein referred to as the "Texas IDR Process"). *See* Tex. Ins. Code §§ 1467.050, *et seq*. and 1467.081, *et seq*.

54.     The specific process for an "out-of-network provider who is not a facility" is mandatory binding arbitration." *Id*. at § 1467.081.

55.     This Texas IDR Process has strict eligibility requirements, including but not limited to the following:

        a.      *First,* the Texas IDR Process applies only to claims for members that have health benefit plans regulated by the Texas Department of Insurance ("TDI"), which includes Texas fully insured HMOs, PPOs, and the Employee Retirement System ("ERS")

---

[7] S. Comm. on Bus. & Commerce, Bill Analysis, Tex. S.B. 1264, 86th Leg., R.S. (2019), Available at: https://capitol.texas.gov/tlodocs/86R/analysis/pdf/SB01264I.pdf.

and Teachers Retirement System plans. Tex. Ins. Code 1467.002(1)-(3). Conversely, it does not apply to out-of-state, self-funded, Medicare/Medicare Advantage, or Medicaid plans.[8]

      b.     *Second*, this Process applies only to: (a) services for out-of-network emergency care; (b) health care, medical services or supplies provided by a facility-based provider in a facility that is a participating provider; (c) an out-of-network laboratory service; or (d) an out-of-network diagnostic imaging service. *See* Tex. Ins. Code § 1467.084(a)(2)(A)-(D).

      c.     *Third*, providers must initiate a dispute within 90 days after the initial payment on a claim seeking benefits for a health care or medical service or supply. *See* Tex. Ins. Code § 1467.084(a).

      d.     *Fourth*, this Process is available only for services for which the parties participated in an informal settlement teleconference not later than the 30th day after the date on which the arbitration was requested. *See* Tex. Ins. Code § 1467.084(d).

56.     TDI oversees this mandatory binding arbitration process, which involves a baseball style arbitration that generally works as follows:

      a.     Not later than 90 days after receiving the initial payment on a claim for services subject to SB 1264, an out-of-network provider can request arbitration via the TDI's online IDR portal;

      b.     Within 30 days of a request for arbitration, all parties must "participate in an informal settlement teleconference";

---

[8] *See* Texas Department of Insurance, *Balance billing: Independent Dispute Resolution*, (June 18, 2025), Available at: https://www.tdi.texas.gov/medical-billing/index.html.

c.    If there is no resolution within the 30-day period, and the parties have not mutually agreed to an arbitrator from a list supplied by the TDI via its online portal, the TDI appoints the arbitrator;

d.    The arbitrator sets the schedule for any submissions by the parties (without any discovery), and must issue an award within 20 days;

e.    The arbitrator must apply a prescribed set of criteria to determine the reasonable amount for any covered services or supplies; and,

f.    Finally, the arbitrator compares the parties' settlement offers and selects the one that is closest to its determination of what is reasonable as the "binding award amount," then issues a written decision accordingly.

*See generally* Tex. Ins. Code § 1467.081, *et seq.*

57.    This Texas IDR Process is costly. In addition to the overhead costs and expenses incurred to participate in the Process, parties must also "pay the arbitrator's fees and expenses." Tex. Ins. Code § 1467.087(e).

58.    To avoid the filing of ineligible disputes under the Texas IDR Process, providers are required to provide information and attest that the service meets eligibility requirements when initiating an arbitration.

59.    As is outlined below, it is nearly impossible to "accidentally" submit an ineligible claim to the Texas IDR Process.

60.    Providers initiate arbitration through a portal on the TDI's website. This portal requires use of a log-in specific to the provider making the request:



61.    Providers must then disclose information about what type of provider they are, the

applicable health plan, their National Provider Identifier ("NPI"), and their name:



62.    The provider must then provide information related to the health care plan and

policy relevant to the service.



63. Providers must then attest they have checked the member's health plan card and that it bears a logo for the Texas Department of Insurance, HealthSelect of Texas, or TRS ActiveCare. If they cannot do so, the TDI portal does not allow the Texas IDR Process to be initiated:



64.    The provider must then input information about the services and the health benefit claim, including date of service, date of first payment on the claim, if an appeal was filed, and whether the provider was out-of-network. Again, if the information entered by the provider does not correspond with eligibility criteria, a message appears in the TDI's portal informing the provider, "You can't file a dispute for this claim":



65.    If a provider makes it through all of these steps, they must finally attest to the accuracy of the information they input to get to the end of the Process, where a message appears asking, "Is everything you entered true and accurate? (Legal action may be taken if you provide false information.)"



66.    The Texas IDR Process is initiated successfully only after a provider (1) inputs all required information in support of the claim's eligibility under SB 1264 and (2) attests that the information is true and accurate.

## **MISUSE AND ABUSE OF THE FEDERAL IDR PROCESS**

67.    When the NSA was passed in 2021, it was estimated that there would be approximately 17,435 disputes submitted to the Federal IDR Process each year.[9] Those estimates turned out to be a drastic underestimate.

68.    Providers submitted 390,346 disputes to the Federal IDR Process in the second half of 2023 alone. In 2024, they initiated 1.5 million disputes—a 300% year-over-year increase and more than 70 times the aforementioned annual case load Congress anticipated.

---

[9] Requirements Related to Surprise Billing, 87 Fed. Reg. 52618 (August 26, 2022) (Final rules under the No Surprises Act).

69.     Two factors are motivating providers to drive these excessive volumes: (1) providers winning a disproportionate amount of these disputes, and (2) the unreasonably high rates that providers are receiving. The costs associated with these IDR Processes are "generating billions of dollars in extra costs for the healthcare system" without delivering more or better services to patients.[10]

70.     Data released by the Center for Medicare and Medicaid Services (CMS) shows that, for the second half of 2024, approximately 85% of Federal IDRs were decided in favor of providers.[11]

71.     Moreover, awards in favor of providers often far exceed market rates for the same services by the same types of providers. The median awarded rate is now four times more than the QPA.[12] In other words, out-of-network providers who participate in Federal IDRs are often getting four times more than the typical rates contracted providers receive for the same services in the same market.

72.     Researchers have commented that "absent corrective action from policymakers, patients will ultimately bear the cost through higher premiums and the administrative overhead of an increasingly exploited arbitration process."[13]

---

[10] Rebecca Pifer, HealthcareDive, *No Surprises dispute resolution is creating billions of dollars in extra costs, could raise premiums: analysis*, (August 27, 2025), Available at: https://www.healthcaredive.com/news/no-surprises-dispute-resolution-driving-health-costs/758713/?utm_source=Sailthru&utm_medium=email&utm_campaign=Issue:%202025-08-27%20Healthcare%20Dive%20%5Bissue:76338%5D&utm_term=Healthcare%20Dive.

[11] *See* Centers for Medicare & Medicaid Services, *Independent Dispute Resolution Reports*, Federal IDR Public Use Files for 2024 Q3 and Q4 (as of May 28, 2025), available at: https://www.cms.gov/nosurprises/policies-and-resources/reports.

[12] *See* Centers for Medicare & Medicaid Services, *Independent Dispute Resolution Reports*, Federal IDR Supplemental Tables for 2024 Q3 and Q4 (as of May 28, 2025), available at: https://www.cms.gov/nosurprises/policies-and-resources/reports.

[13] Lawson Mansell & Sage Mehta, Niskanen Center, *New data shows No Surprises Act arbitration is growing healthcare waste*, (June 18, 2025), Available at: https://www.niskanencenter.org/new-data-shows-no-surprises-act-arbitration-is-growing-healthcare-waste/.

73.     While these abuses and distortions are big issues, they are driven by a small number of entities. A handful of large (often private-equity backed) companies are attempting to weaponize the Texas and Federal IDR Processes to extract supra-competitive rates. These companies are the primary drivers of both the increase in the number of Federal IDR disputes being initiated and the increase in the offer amounts observed in the first two quarters of 2024.[14]

74.     Indeed, just five entities, including HaloMD, are responsible for submitting ***two-thirds of all*** Federal IDR disputes in the first and second quarters of 2024.[15]

75.     Since HaloMD became active, the average IDR award for neuromonitoring services—where HaloMD plays an outsized role in the market— has skyrocketed from just under 400% of QPA in Q2 of 2023 to 1200% of QPA (or higher) starting in Q4 of 2023.[16]

76.     On information and believe, it is "middleman organizations" like HaloMD driving the higher volume of IDR disputes that ultimately increases costs across the entire healthcare system.

## HALOMD

77.     HaloMD is one of the largest abusers of the Federal and Texas IDR Processes.

78.     Alla LaRoque is the president and founder of HaloMD. Despite touting herself and her company as a leading expert in healthcare billing and the NSA, Mrs. LaRoque does not have a longstanding career in healthcare. Indeed, before 2014 when her husband Mr. Scott LaRoque

---

[14] *See* Centers for Medicare & Medicaid Services, *Independent Dispute Resolution Reports*, Federal IDR Supplemental Tables for 2024 Q1 and Q2 (as of May 28, 2025), available at: https://www.cms.gov/nosurprises/policies-and-resources/reports.

[15] The other four are: Team Health, Radiology Partners, SCP Health, and AGS Health. TeamHealth, Radiology Partners, and SCP Health are all owned by private-equity companies and have a business model of market consolidation which has resulted in decreased competition and increased prices. AGS Health and HaloMD are revenue cycle management companies who contract with providers to, as relevant here, submit disputes to the Federal and state IDR Processes.

[16] *Id.*

made her the Chief Operating Officer of his company, National Neuromonitoring, Ms. LaRoque had no prior experience in the healthcare industry.[17]

79.     Alla and Scott LaRoque then gained experience with out-of-network billing through another one of their companies, MPOWERHealth, and its web of affiliated intraoperative neuromonitoring ("IOM") and surgical assists companies (hereinafter, "MPowerHealth Affiliates").[18]

80.     Through this work, Alla and Scott LaRoque realized that, after the enactment of legislation like the NSA and SB 1264, providers could bill out-of-network and challenge reimbursement through the through IDR Processes, potentially gaming more than market rates.

81.     Accordingly, in 2022, Alla and Scott LaRoque created HaloMD, which advertises itself as "the premier expert in Independent Dispute Resolution (IDR), with an exclusive focus on navigating the complexities of The No Surprises Act and state-level regulations" and "empower[ing] out-of-network providers to secure sustainable, predictable revenue streams."[19]

82.     While it holds itself out as a standalone company, HaloMD is largely an extension of the MPowerHealth Affiliates. Indeed, the majority of the services/claims for which HaloMD

---

[17] Before that, Ms. LaRoque was known as Alla Kosova, then Alla Wartenberg, and worked in Las Vegas, Nevada as an adult entertainment dancer. She then operated a chain of salons and day spas in the Las Vegas area. *See* The Today Show, *'Apprentice' hopeful has X-rated past*, (September 14, 2005), Available at: https://www.today.com/popculture/apprentice-hopeful-has-x-rated-past-wbna9340078.

[18] Upon information and belief, MPOWERHealth helped establish dozens of IOM and surgical assist companies using a model similar to what OIG has previously opined "would present a host of risks of fraud and abuse under the Federal anti-kickback statute, including patient steering, unfair competition, inappropriate utilization, and increases costs to Federal health care programs." Department of Health and Human Services Office of the Inspector General ("OIG") Advisory Opinion 23-05.

[19] *See* HaloMD, *No Suprises Act Leading Experts*, (Last Accessed: July 24, 2025), available at: https://halomd.com/.

initiates disputes though the IDR Processes are for MPowerHealth Affiliates. Thus, HaloMD and MPowerHealth are really all one and the same.

83.    Among other things, both HaloMD and MPOWERHealth are headquartered in the same building: 5080 Spectrum Drive, E Addison, Texas. HaloMD and the MPowerHealth Affiliates also jointly hire employees (*e.g.*, MPOWERHealth lists job opportunities for HaloMD).

84.    HaloMD and the MPowerHealth Affiliates also share employees.

85.    Roxanna LaRoque—a family member of Scott and Alla LaRoque and MPOWERHealth's Director of Client Experience—is identified as an "Authorized Official" on the U.S. Centers for Medicare & Medicaid Services ("CMS") national provider identifier registry for dozens of MPowerHealth Affiliates, many of which share the same reported address.

86.    HaloMD has quickly become one of the highest initiators of disputes under the Federal IDR Process. While HaloMD filed fewer than 1% of disputes in the Federal IDR Process in 2023, that number jumped to 10% in 2024.

87.    HaloMD now finds itself among the five entities responsible for filing two-thirds of all NSA disputes in 2024.

88.    Since September of 2022, HaloMD has initiated nearly 112,000 Federal IDR disputes and 12,000 Texas IDR disputes as to BCBSTX.

### HALOMD'S ABUSE OF THE FEDERAL AND TEXAS IDR PROCESSES

89.    At the direction of Scott and Alla LaRoque, HaloMD's business model is built on lies and misrepresentations, which ultimately damage both BCBSTX and its plan sponsors to the tune of hundreds of millions of dollars.

90.    The scheme works as follows:

91.    First, as set forth above, Scott and Alla LaRoque created the MPowerHealth affiliates and established relationships with other out-of-network providers.

92.    After one of these aforementioned providers renders care to a patient, the provider authorizes HaloMD to initiate out-of-network payment disputes related to those services, including through the Texas and Federal IDR Processes. HaloMD is paid solely on a contingency basis, advertising: "We don't get paid until your dispute is settled or awarded by arbitrator."[20]

93.    Next, HaloMD stockpiles claim information for services a provider submitted to a health plan and then submits massive numbers of open negotiations and IDR initiations all at once. Upon information and belief, this tactic (among others) is used to overwhelm the health plan's ability to meaningfully respond or contest eligibility.

94.    In doing so, and in order to initiate the open negotiations period and formal IDR Processes, HaloMD makes a series of misrepresentations to BCBSTX, the entities overseeing the IDR Processes, and state or federal governmental bodies to make a service appear eligible for either the NSA or SB 1264 (when it was not), including:

    a.    Misrepresenting that the patient had a health benefit plan administered or insured by BCBSTX;

    b.    Misrepresenting the type of health benefit plan applicable to a given service or claim, the group policy number for the relevant health benefit plan, and the plan ID for the relevant health benefit plan;

    c.    Misrepresenting the type of underlying medical services provided;

    d.    Misrepresenting the date that the underlying medical service was provided;

---

[20] *Id.*

e.    Misrepresenting that the parties participated in an open negotiation period or informal settlement teleconference and the date of the same;

f.    Misrepresenting that the provider filed an appeal with the health plan;

g.    Attesting the information submitted, inputted, or otherwise provided into the Texas IDR Process portal is accurate when, in fact, its not; and,

h.    Attesting that the "qualified IDR items or services are within the scope of the Federal IDR process."

95.    When HaloMD initiates an open negotiation on an item or service that is not eligible, BCBSTX aims to point that out when able (according to the volume of IDRs initiated), as illustrated in this following example:



**BlueCross BlueShield** of Texas

December 16, 2024
RE: ▓▓▓▓▓▓▓▓▓▓▓▓
Dear ▓▓▓▓▓▓▓▓:

We have received your request on December 11, 2024, disputing claim number ▓▓▓▓▓▓▓▓▓▓.

Items or services billed do not qualify for the NSA process. Eligible services will be noted on your Provider Claims Summary.

After further review, it has been determined this request is ineligible due to the member not being a BlueCross BlueShield member.

Claims for the following services, which are not subject to a specified state law, may be eligible for payment review under NSA if you don't have a contract with us.

· Emergency services or stabilization for an emergency
· Services provided by non-participating providers at a contracted facility
· Air ambulance Services

Sincerely,
Independent Dispute Resolution Team

96.     Despite knowing, and being informed, that the items and services are not eligible for the respective IDR Process, HaloMD moves ahead in initiating the formal IDR Processes by further misrepresenting that the items and services are eligible when they are not.

97.     As a result of these misrepresentations, HaloMD then procures awards, typically at dramatic rates, on ineligible items and services (in the Federal IDR Process) and claims (in the Texas IDR Process).

98.     BCBSTX is then forced to pay administrative fees (in the Federal IDR Process) and the arbitrator's fees and expenses (in the Texas IDR Process). There are also significant overhead costs and expenses incurred by BCBSTX in order to participate in the Texas and Federal IDR Processes for services and claims that are ineligible.

99.     The end result of HaloMD's fraudulent submissions of ineligible items and services and claims to the Federal and State IDR Processes is that BCBSTX and its plan sponsors have had well over $100 million in awards and administrative fees levied against them related to services and claims that were not eligible for the Federal and State IDR Processes.

100.    The following are just a few representative examples where HaloMD improperly procured awards under the Federal and Texas IDR Processes for ineligible claims or services using fraudulent and false representations.

*DISP-2821912 (State Specified Law Applies)*.

101.    On November 10, 2024, Longview ER Operations, LLC ("Longhorn ER") provided medical services to a BCBSTX member with a fully-insured health benefits plan.

102.    Thereafter, on December 17, 2024, BCBSTX sent Longhorn ER a provider claim summary, explaining that the services had been reimbursed at $▮▮▮▮. The provider claim summary further provided that the services were subject to "Texas law" and that if Longhorn ER

"disagree[d] with the payment amount, [it] could request mediation or arbitration by submitting a request" to the TDI:

```
(T97).  UNDER THE TEXAS LAW,A MEMBER MUST NOT BE BILLED ABOVE THEIR COST-SHARE
```

```
ANY MESSAGES WILL BEGIN ON PAGE    27

          FOR NON-NETWORK ER CARE,FACILITY-BASED CARE OR LAB/DIAGNOSTIC IMAGING.
          IF YOU DISAGREE WITH THE PAYMENT AMOUNT, YOU CAN REQUEST MEDIATION OR
          ARBITRATION BY SUBMITTING A REQUEST AT WWW.TDI.TEXAS.GOV. ONCE
          SUBMITTED, PLEASE NOTIFY BCBSTX AT TX.PROVIDER.ARBITRATION@BCBSTX.COM.
```

103.     Nevertheless, HaloMD initiated an open negotiations period for these services on February 4, 2025 in the *Federal* IDR Process.

104.     In response, BCBSTX sent a letter the next day explaining (again) that these services were ineligible for the Federal IDR Process:



**BlueCross BlueShield**
of Texas

February 05, 2025
RE: ████████████
Dear Longview Er Operations Llc:

We have received your request on February 04, 2025, disputing claim number
████████████

Items or services billed do not qualify for the NSA process. Eligible services will be noted on your Provider Claims Summary.

After further review, it has been determined State specified law applies to this item or service. As a result, the No Surprises Act IDR Process is not applicable. The health plan type is PREM.

Claims for the following services, which are not subject to a specified state law, may be eligible for payment review under NSA if you don't have a contract with us.

· Emergency services or stabilization for an emergency
· Services provided by non-participating providers at a contracted facility
· Air ambulance Services

Sincerely,
Independent Dispute Resolution Team

105.    Despite this, HaloMD initiated a formal Federal IDR Process for these services on March 21, 2025. To do so, HaloMD made material misrepresentations to make the claim appear eligible when it knew it was not.

106.    *First*, HaloMD input information that the applicable health plan was a "partially or fully self-insured private (employment-based) group health plan" and that it was governed by ERISA:



107.    But, from both the provider claim summary and letter sent by BCBSTX, HaloMD

knew that the applicable health benefits plan was fully-insured. Nevertheless, HaloMD submitted

false information to make the claim appear eligible for the Federal IDR Process.

108.    *Second*, HaloMD falsely attested that the "item(s) and/or service(s) at issue are

qualified item(s) and/or service(s) within the scope of the Federal IDR process":

> **Conflict of Interest Attestation**
>
> ✓ I, the undersigned initiating party (or representative of the initiating party), attest that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.
>
> **Signature:**                                **Date:**
> HaloMD                                         03/21/2025

109.    Again, however, this was not true and HaloMD knew that at the time it signed this

attestation.

110.    As part of its submission in the formal Federal IDR Process, BCBSTX explained to the IDRE that the applicable health benefits plan was "Fully Insured" and therefore "the No Surprises Act IDR Process is not applicable":

> Objection to the following items or services. State specified law applies to this item or service. As a result, the No Surprises Act IDR Process is not applicable for the following claims. Specific citation for the state law applicable to this item or service is Tex. Ins. Code 14677.001 et seq.(1467.051, 1467.082). ████████████, TX, Funding Type: Fully Insured

111.    Nevertheless, HaloMD's misrepresentations caused an award to be rendered against BCBSTX in the amount of $████—which is more than ***1,000% higher*** than the QPA (*i.e.*, median in-network rate) for these services.

112.    On top of this, BCBSTX was forced to incur administrative expenses of $850 for this improper IDR.

113.    All of the foregoing was caused by HaloMD's fraudulent and false misrepresentations in the Federal IDR Process.

### *DISP-2625952 (Medicare Health Benefits Plan)*.

114.    On October 22, 2024, Precision Emergency Physicians PPLC ("Precision") provided medical services to a BCBSTX member with a Medicare plan.

115.    Thereafter, on December 30, 2024, BCBSTX sent Precision a provider claim summary, explaining that the services had been reimbursed at $████. The provider claim summary also denoted the claim type was "MC"—referring to the health benefit plan being through Medicare:



116.     The provider claim summary also explained that the services were reimbursed at the allowable rate determined by Medicare:

( 4 ). PAYMENT CANNOT EXCEED THE ALLOWABLE CHARGE DETERMINED BY MEDICARE.

117.     As mentioned above, neither the Federal NSA, nor SB 1264, apply to Medicare. Nevertheless, on January 7, 2025, HaloMD initiated an open negotiations period under the Federal IDR Process for these Medicare services.

118.     Then, on February 22, 2025, HaloMD initiated the formal Federal IDR Process for these services. To do so, HaloMD made material misrepresentations.

119.     *First*, HaloMD represented that the applicable health benefits plan was "partially or fully self-insured private (employment-based) group health plan":



120.     This was false because, as HaloMD knew, the applicable health benefits plan was through Medicare.

121.    *Second*, HaloMD attested that the "item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process":

> ☑ I, the undersigned initiating party (or representative of the initiating party), attest that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.
>
> **Signature:**                                    **Date:**
> HaloMD                                              02/22/2025

122.    Again, however, HaloMD knew this attestation was false because the plan at issue was a Medicare plan, which makes the Federal NSA inapplicable.

123.    BCBSTX explained in its submission to the IDRE that the services were ineligible for the Federal IDR Process because it had already paid the allowable charge determined by Medicare:

> ✓ This dispute includes items or services under a coverage type not subject to the No Surprises Act.
>
> **\* Which items or services are under a coverage type not subject to the NSA and what coverage type(s) is the item or service under?**
>
> Objection to the following items or service which are under a coverage type not subject to the No Surprises Act: PAYMENT CANNOT EXCEED THE ALLOWABLE CHARGE DETERMINED BY MEDICARE. Therefore, this submission is not eligible for the Federal IDR Process. ███████████████

124.    Nevertheless, HaloMD's misrepresentations caused an award in the amount of $█████ against BCBSTX. This is over ***500% greater*** than the reimbursement rate set by Medicare.

125.    On top of this, BCBSTX also incurred administrative expenses of $1,025.

126.    All of the foregoing was caused by HaloMD's fraudulent and false misrepresentations in the Federal IDR Process.

***DISP-1482789 (Failure to Timely Initiate).***

███████████████

127.    On September 15, 2023, EMER North Forth Worth Beach provided emergency room services (CPT code 99285) to a BCBSTX member insured by a BCBSTX group health benefits plan.

128.    On October 12, 2023, this claim was reimbursed by BCBSTX at $█████.

129.    Consistent with the NSA, the provider then had 30 business days from the date it received BCBSTX's payment determination to initiate the IDR open negotiations period, which was November 24, 2023 in this instance.

130.    On November 29, 2023—after the statutorily-proscribed deadline—HaloMD (on behalf of EMER North Fort Beach LLC) emailed BCBSTX a "notice of open negotiation initiation by provider."

131.    On December 5, 2023, BCBSTX sent a letter explaining that the timely filing requirements were not met:



**BlueCross BlueShield of Texas**

December 05, 2023
RE: ▮▮▮▮▮▮▮▮▮▮
Dear Emer North Fort Worth Beach:

We have received your request on November 29, 2023, disputing claim number
▮▮▮▮▮▮▮▮▮.

Items or services billed do not qualify for the NSA process. Eligible services will be noted on your Provider Claims Summary.

After further review, it has been determined timely filing requirement was not met. The No Surprises Act IDR process is not applicable. An open negotiation request must be initiated within 30 business days beginning on the day the Out Of Network (OON) provider receives either an initial payment or notice.
Your request was received on: 11/29/2023
Initial Payment or Notice Date: 10/12/2023

Claims for the following services, which are not subject to a specified state law, may be eligible for payment review under NSA if you don't have a contract with us.

· Emergency services or stabilization for an emergency
· Services provided by non-participating providers at a contracted facility
· Air ambulance Services

Sincerely,
Independent Dispute Resolution Team

132.    There was no further correspondence between HaloMD and BCBSTX related to these services for many months.

133.    Then, over *six months later*, on June 27, 2024, HaloMD initiated a Federal IDR dispute for these services.

134.    In doing so, HaloMD accurately noted that the open negotiations period for these services had begun on November 29, 2023. However, this prompted the NSA Portal to state: "The federal IDR process must be initiated within four business days of the open negotiation period ending. Please provide a reason why this dispute is eligible for an extension to this requirement."

███████████████

135.    In response, HaloMD stated that: "The item(s) or service(s) under dispute was subject to the 90-day cooling off period which ended no more than 30 business days from today" and pointed to documentation from another IDR Process, DISP-769827:

> **The federal IDR process must be initiated within four business days of the open negotiation period ending. Please provide a reason why this dispute is eligible for an extension to this requirement:**
> The item(s) or service(s) under dispute was subject to the 90-day cooling off period which ended no more than 30 business days from today.
> **Proof of 90 Day Cooling Period Documentation:**
> DISP-769827_FinalPaymentDetermination.pdf
> ONN.pdf
> IOP.pdf
> EOB.pdf
> EMAIL.pdf

136.    However, the "cooling off period" is triggered by an award. The IDR Process that HaloMD referenced—DISP-769827—had an award issued on **February 20, 2024**. Therefore, this award cannot explain why—back in **November of 2023**—HaloMD failed to meet the federal IDR initiation deadline for services rendered in **September 2023.**

137.    As a result of HaloMD's false representations regarding the timeliness of its initiation of the Federal IDR Process, which HaloMD hid from the IDRE by falsely alleging a "cooling off period" applied, HaloMD was able to procure an award against BCBSTX on October 15, 2024, in the amount of $█████.

138.    This amount is over 585% higher than the QPA, (*i.e.*, the median in-network rate) for these same services.

139.    On top of this inflated sum, BCBSTX was also forced to incur administrative expenses of $710.

140.    All of the foregoing was caused by HaloMD's fraudulent and false misrepresentations in the Federal IDR Process.

███████████████

*DISP-2253284 (Failure to Engage in Open Negotiations).*

141.    On August 25, 2024, IES Central Texas PLLC ("IES") performed emergency services for a member with benefits through Blue Shield of California and hosted by BCBSTX.

142.    On October 15, 2024, BCBSTX sent IES a provider claim summary related to these services.

143.    BCBSTX did not hear any further from IES related to these services until December 13, 2024, when BCBTX received notice that HaloMD had initiated a formal Federal IDR Process for these services.

144.    As noted above, a provider must first initiate open negotiation via written notice within 30 days of the health plan's first notice of payment or denial for the item or service. *See* 42 U.S.C. § 300gg-111(c)(1)(A). However, no such written notice was ever received from IES or HaloMD related to the services prior to HaloMD initiating the formal federal IDR Process.

145.    In order to do so, HaloMD misrepresented to the IDRE that an open negotiation period had started on October 29, 2024:

---

**Dispute Reference Number: DISP-2253284**

**Qualification Questions**

Was the service in question provided prior to 1/1/2022?
No

I'm a(n):
Health care provider

Tax ID:                                            National Provider Identifier (NPI):
920872236                                     1003523002

Health Plan Type:
Either partially or fully self-insured private (employment-based) group health plan

ERISA Plan self insured
Yes

When did the open negotiation period start?
10/29/2024

Proof of Open Negotiation Documentation:
465902-ProofOfOpenNegotiation-465902-proofofopennegotiation.pdf

---

██████████████

146.     But this was a misrepresentation, as BCBSTX had never received any written notice of open negotiation being commenced related to these services, on this date or otherwise.

147.     BCBSTX explained this issue in its submission to the IDRE, namely that an "open negotiation period was not completed for this dispute at the time of IDR submission":

> Objection to the following items or services. The open negotiation period was not completed for this dispute at the time of IDR submission. 30 business days have not elapsed since the initiating party submitted the open negotiation notice.  0202427050568V30X, Open Negotiation Notice Received Date: 12/13/2024, Open Negotiation End Date: 01/29/2025

148.     Nevertheless, HaloMD's above-mentioned misrepresentations caused an award in the amount of $███████ against BCBSTX.

149.     This is over 500% greater than the reimbursement rate set by Medicare.

150.     On top of this, BCBSTX also incurred administrative expenses of $710.00.

151.     All of the foregoing was caused by HaloMD's fraudulent and false misrepresentations in the Federal IDR Process.

\*          \*          \*

152.     The foregoing are examples of the many thousands of ineligible claims that HaloMD submitted into the Federal IDR Process.

153.     BCBSTX estimates that, to date, HaloMD has procured awards on over 42,000 ineligible claims from BCBSTX.

## HALOMD'S PRACTICE OF SUBMITTING IDRS TO BOTH STATE AND FEDERAL IDR PROCESSES WHEN A CLAIM CANNOT BE ELIGIBLE FOR BOTH

154.    Rather than take the time to assess eligibility for the Federal or Texas IDR Processes, HaloMD consistently initiated *both* Federal and Texas IDRs for the same claim or items and services, despite knowing that they could only be eligible for one or the other.

155.    This has resulted in many instances where HaloMD received two awards for the same underlying medical service.

156.    A disputed claim cannot be eligible for both the Federal and Texas IDR—there is no overlap in claims that are eligible for both.

157.    Indeed, a condition of eligibility for the Federal IDR Process is the absence of any applicable "specified state law," such as the Texas IDR. *See* 42 U.S.C. § 300gg-111(c)(1)(B).

158.    CMS's guidance explains that "[i]f [a] state law applies to the consumer's bill and provides at least the same level of consumer protection as the No Surprises Act, the state law will generally apply."[21]

159.    CMS has also cautioned that "[i]t is important to determine whether a state law may apply to a consumer complaint *before* disputing a bill under the No Surprises Act or reporting a No Surprises Act violation."[22]

160.    CMS even has a "Help Desk" available 7 days a week to "help determine whether state law applies."[23]

---

[21] U.S. Centers for Health and Human Services, U.S. Department of Labor, and The Department of the Treasury, *State Surprise Billing Laws and the No Suprises Act*, (August 9, 2023), Available at: https://www.cms.gov/files/document/nsa-state-laws.pdf
[22] *Id*.
[23] *Id*.

161.    The Texas Department of Insurance has also published information to help providers determine whether the Texas IDR Process is applicable to a given claim:[24]

> ### How can you tell if a plan is regulated by TDI?
>
> - The patient's insurance card will have TDI or DOI on it. See examples
> - The patient is insured through:
>
>     ○ Employees Retirement System of Texas (ERS): HealthSelect and other ERS plans
>
>     ○ Teacher Retirement System of Texas (TRS): TRS ActiveCare and TRS-Care Standard for non-Medicare retirees
>
>     ○ Texas Farm Bureau or an employer plan that has opted into the Texas balance billing laws. The patient's insurance card might have TXI on it.

162.    Accordingly, HaloMD's misrepresentations about eligibility being deliberate, knowing, and intentional is illustrated through its improper initiation of both the Texas and Federal IDR Processes for the same underlying medical services.

163.    There are ***more than 5,400 duplicate claims*** for which HaloMD initiated disputes under both the Federal and Texas IDR Processes. The following are just a few representative examples:

***DISP-1956323 & TDI #1305469.***

164.    On March 19, 2024, I35 EP, PPLC provided critical care services (CPT codes 99291, 99292) to a BCBSTX member with a health benefits plan from the Employees Retirement System of Texas.

165.    This claim for reimbursement was reimbursed by BCBSTX at $███.

---

[24] *See* Texas Department of Insurance, *Balance billing: health care provider resources*, (June 6, 2025), Available at:  https://www.tdi.texas.gov/medical-billing/providers.html.

166.    Thereafter, on July 2, 2024, HaloMD requested arbitration on behalf of I35 EP, PPLC under the Texas IDR Process, challenging BCBSTX's reimbursement of this claim.

167.    Because the member had a health benefits plan from the Employees Retirement System of Texas, this claim was properly subject to the Texas IDR Process—and *not* the Federal IDR Process. *See* Tex. Ins. Code 1467.002(1)-(3).

168.    On July 23, 2024, HaloMD and BCBSTX held an informal teleconference, as required by the Texas IDR Process, *see* Tex. Ins. Code § 1467.084(d), where they agreed to settle the arbitration through BCBSTX reimbursing I35 EP, PPLC an additional $███.

169.    BCBSTX reimbursed I35 EP, PPLC this agreed upon amount on July 26, 2024, and sent an explanation of benefits ("EOB") detailing this additional payment and explaining the claim now "may not be refiled":

```
MESSAGES:
        ( 1).  THIS CLAIM HAS PREVIOUSLY BEEN NEGOTIATED/ARBITRATED PURSUANT TO STATE
               REGULATION.  THIS CLAIM MAY NOT BE REFILED, AND THE MEMBER IS NOT
               RESPONSIBLE FOR AMOUNTS ABOVE THEIR COST SHARE.
```

170.    Nevertheless, on September 6, 2024, HaloMD initiated the open negotiations period for these *same* services under the Federal IDR Process:



I35EP PLLC (1194184606) is initiating an open negotiation period with BCBS TX for the out-of-network rate of the following item(s) and/or service(s). To negotiate, please contact me (the initiating party) at the e-mail address or number below:

Item(s) and/or service(s):

| Description of item(s) and/or service(s) | Claim # | Name of provider, and National Provider Identifier (NPI) | Date provided | Service code | Units billed per code | Initial payment (If no initial payment amount, write N/A) | Offer for total out-of-network rate (including any cost sharing) |
|---|---|---|---|---|---|---|---|
| CRITICAL CARE ILL/INJURED PATIENT INIT 30-74 MIN | ▮▮▮ | I35EP PLLC (NPI: 1194184606) | 03/19/2024 | 99291 | 1 | ▮▮▮ | 3,776.10 |
| CRITICAL CARE ILL/INJURED PATIENT ADDL 30 MIN | ▮▮▮ | I35EP PLLC (NPI: 1194184606) | 03/19/2024 | 99292 | 1 | ▮▮▮ | 1,333.97 |

_Megan Rausch_

Signature

Megan Rausch

Print Name

2915 W Bitters Rd #201, San Antonio, TX 78248

Mailing Address

nutexNSA@halomd.com

Email Address

09/06/2024

Date

Provider Representative

Relationship to Person(s) or entity

(210) 598-4263

Telephone Number

171.    Three days later—on September 9, 2024—BCBSTX sent HaloMD a letter explaining that these services were ineligible for the Federal IDR Process:



**BlueCross BlueShield**
of Texas

September 09, 2024
RE: ███████████████
Dear I35 Ep Pllc:

We have received your request on September 06, 2024, disputing claim number
███████████████ .

Items or services billed do not qualify for the NSA process. Eligible services will be noted on your Provider Claims Summary.

After further review, it has been determined State specified law applies to this item or service. As a result, the No Surprises Act IDR Process is not applicable.  The health plan type is ASO.

Claims for the following services, which are not subject to a specified state law, may be eligible for payment review under NSA if you don't have a contract with us.

· Emergency services or stabilization for an emergency
· Services provided by non-participating providers at a contracted facility
· Air ambulance Services

Sincerely,
Independent Dispute Resolution Team

172.    Nevertheless, HaloMD initiated the Formal IDR Process on these services on October 22, 2024:



**Dispute Reference Number: DISP-1956323**

**Qualification Questions**

**Was the service in question provided prior to 1/1/2022?**
No

**I'm a(n):**
Health care provider

**Tax ID:**
███████

**National Provider Identifier (NPI):**
1194184606

**Health Plan Type:**
Either partially or fully self-insured private (employment-based) group health plan

173.    HaloMD further falsely attested that the services were "qualified item(s) or service(s) within the scope of the Federal IDR process":

**Certified IDR entity legal business name:**
C2C Innovative Solutions, Inc.

**Third Party Attestation:**
Yes

**Conflict of Interest Attestation**
☑ I, the undersigned initiating party (or representative of the initiating party), attest that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.

**Signature:**                          **Date:**
HaloMD                                  10/22/2024

174.    As a result of these false representations, and for services that HaloMD had already settled with BCBSTX in the Texas IDR Process, HaloMD was able to procure an award against BCBSTX on April 24, 2025 in the amount of $██████.

175.    This amount is over 489% higher than the QPA.

176.     On top of this inflated sum, BCBSTX was also forced to incur administrative expenses of $870—again, all for services that HaloMD already settled and knew to be ineligible for Federal IDR.

   ***DISP-1033213 & TDI #1011919.***

177.     On November 13, 2023, Guardian Neurology PLLC ("Guardian") provided services (CPT code 95955) to a BCBSTX member with a preferred provider organization ("PPO") health benefits plan.

178.     BCBSTX adjudicated this claim and provided Guardian with a provider claim summary on November 21, 2023.

179.     On December 20, 2023, HaloMD requested arbitration on behalf of Guardian under the Texas IDR Process challenging BCBSTX's reimbursement of this claim.

180.     A few weeks later, after already requesting arbitration in the ***Texas IDR Process***, HaloMD then sent BCBSTX notice that it was initiating an open negotiations period for these same services under the ***Federal IDR Process***.

181.     BCBSTX promptly sent HaloMD and Guardian a letter noting that the federal "No Surprises Act IDR Process is not applicable":



BlueCross BlueShield
of Texas

January 11, 2024
RE: ███████████████████
Dear Guardian Neurology Pllc:

We have received your request on January 02, 2024, disputing claim number
██████████████████

Items or services billed do not qualify for the NSA process. Eligible services will be noted on
your Provider Claims Summary.

After further review, it has been determined that claim does not meet the criteria.  The No
Surprises Act IDR Process is not applicable.

Claims for the following services, which are not subject to a specified state law, may be eligible
for payment review under NSA if you don't have a contract with us.

· Emergency services or stabilization for an emergency
· Services provided by non-participating providers at a contracted facility
· Air ambulance Services

Sincerely,
Independent Dispute Resolution Team

182.    Then, on February 8, 2024, the arbitrator in the Texas IDR Process rendered an

award in favor of Guardian in the amount of $████.

183.    BCBSTX reimbursed Guardian in accordance with this decision on February 20,

2024 and sent a Provider Claim Summary detailing this additional payment, explaining the claim

now "may not be refiled":

MESSAGES:
( 1).   THIS CLAIM HAS PREVIOUSLY BEEN NEGOTIATED/ARBITRATED PURSUANT TO STATE
        REGULATION.  THIS CLAIM MAY NOT BE REFILED, AND THE MEMBER IS NOT
        RESPONSIBLE FOR AMOUNTS ABOVE THEIR COST SHARE.
( 2).   PROGRAM REQUIREMENTS AS IDENTIFIED BY THE MEMBER'S CONTRACT HAVE NOT
        BEEN FULFILLED.  THIS IS THE PATIENT'S LIABILITY.

██████████████

184.    Despite its knowledge of the claim's ineligibility for the Federal IDR process, on February 19, 2024, HaloMD initiated the Federal IDR Process for the ***same claim*** referenced above that it received an award in the Texas IDR Process for—the same provider, patient, service date, and CPT code).

185.    Nevertheless, and despite the foregoing, HaloMD further falsely attested that the services were "qualified item(s) or service(s) within the scope of the Federal IDR process":

> **Conflict of Interest Attestation**
> ✔ I, the undersigned initiating party (or representative of the initiating party), attest that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.
>
> **Signature:**                                                **Date:**
> HaloMD                                                         02/19/2024

186.    As a result of these false representations for services that HaloMD had already settled with BCBSTX in the Texas IDR Process, and that HaloMD knew were ineligible for the Federal IDR Process, HaloMD caused an award against BCBSTX on November 19, 2024, in the amount of $████.

187.    BCBSTX was also forced to incur administrative expenses of $1,510—again, all for services that HaloMD already settled and knew to be ineligible for Federal IDR.

## DEFENDANTS PROCURE AWARDS THAT EXCEED BILLED CHARGES ON INELIGIBLE CLAIMS AND SERVICES

188.    As discussed above, the reason for Defendants' abuse of the IDR Processes is clear—they are getting a massive windfall.

189.    Congress' intent was to make the median in-network rate—known as the QPA—a key metric in the Federal IDR process as opposed to a provider's "billed charges," an arbitrary amount chosen by a provider to charge for a given service or item. *See* Requirements Related to

Surprise Billing: Part II, 86 Fed. Reg. at 55,996 (Oct. 7, 2021) (median contracted rates typically represent reasonable market values because they "are established through arms-length negotiations between providers and facilities and plans and issuers (or their service providers).").

190.     Indeed, Congress specifically noted in enacting the NSA that it was looking to combat "inflated out-of-network prices." H.R. REP. 116-615, 53 (December 2, 2020).

191.     Despite this intent, HaloMD has obtained awards in the Federal IDR Process that are often significantly higher than the QPA and, at times, higher than the underlying providers' own billed charges for the services being disputed.

192.     There is no legitimate basis for a provider to obtain an award at an amount higher than what they charge for a given service.

193.     As one example, on April 9, 2024, Precision Emergency Physicians ("Precision") rendered services to a BCBSTX member. Precision's billed charges for these services were $2,645.83.

194.     BCBSTX adjudicated Precision's claims for these services, and provided Precision with a provider claims summary that specified the Texas IDR Process (and, thus, not the Federal IDR Process) applied:

(11).  UNDER THE TEXAS LAW,A MEMBER MUST NOT BE BILLED ABOVE THEIR COST-SHARE
       FOR NON-NETWORK ER CARE,FACILITY-BASED CARE OR LAB/DIAGNOSTIC IMAGING.
       IF YOU DISAGREE WITH THE PAYMENT AMOUNT, YOU CAN REQUEST MEDIATION OR
       ARBITRATION BY SUBMITTING A REQUEST AT WWW.TDI.TEXAS.GOV. ONCE
       SUBMITTED, PLEASE NOTIFY BCBSTX AT TX.PROVIDER.ARBITRATION@BCBSTX.COM.

195.     Nevertheless, HaloMD initiated a Federal IDR Process related to these services (DISP-2846911) by making false representations that the services were eligible for the Federal IDR Process when HaloMD knew that to be false.

196.    Then, despite Precision's own billed charges for these services being $**2,645.83**, HaloMD then sought—and received an award of—$**3,270.83**:

C2C Innovative Solutions, Inc. has reviewed your Federal Independent Dispute Resolution (IDR) dispute with reference number **DISP-2846911** and has determined that PRECISION EMERGENCY PHYSICIANS is the prevailing party in this dispute.

After considering all permissible information submitted by both parties, C2C Innovative Solutions, Inc. has determined that the out-of-network payment amount of **$3,270.83** offered by PRECISION EMERGENCY PHYSICIANS is the appropriate out-of-network rate for the item or service 99291 on claim number ███████████ under this dispute.

C2C Innovative Solutions, Inc. based this determination on a review of the following:

PRECISION EMERGENCY PHYSICIANS submitted an offer of $3,270.83

197.    Not only is this award procured by HaloMD over $625 higher than Precision's own billed charges (effectively charging two different prices for the same product or service solely because an insurer would pay all or part of the higher price) but it is also ***over 1000%*** higher than the QPA for these same services.

198.    This IDR Process is just one example of the NSA going drastically wrong and how HaloMD has abused the process.

### **HALOMD'S "DELAY AND DUMP" TACTICS**

199.    HaloMD's malice in carrying out this scheme is also demonstrated through the manner in which initiated open negotiations or the formal Federal and Texas IDR Processes.

200.    As previously mentioned, HaloMD stockpiles services from a provider for a certain health plan and submits massive numbers of open negotiations and IDR initiations all at once, often over holidays or weekends.

201.    Upon information and belief, this is "delay and dump" tactic is undertaken to overwhelm the health plan's ability to meaningfully respond or contest eligibility.

202.    For example, on November 25 and 26, 2024—the days immediately before Thanksgiving—HaloMD initiated IDR disputes against BCBSTX on 647 services. Then, on November 29 and 30, 2024—the Friday and Saturday immediately after Thanksgiving—HaloMD initiated another 1,204 IDR disputes. In comparison, on a less significant day such as December 3, 2024, HaloMD initiated a total of 3 IDR disputes against BCBSTX.

203.    As another example, on December 24 and 26, 2024, the days before and after Christmas, HaloMD initiated 3,411 disputes against BCBSTX. Again, in comparison, HaloMD only initiated 21 disputes against BCBSTX the Monday after (December 30, 2024).

204.    Of the 1,851 disputes HaloMD submitted over Thanksgiving in 2024, nearly 20% were ineligible, while of the 3,411 disputes filed just before Christmas in 2024, over 10% were ineligible.

205.    Altogether, HaloMD was able to procure awards of $2,237,382.72 on these ineligible services and claims mass-dumped onto BCBSTX over Thanksgiving and Christmas of 2024.

206.    The combined effect of HaloMD's "delay and dump" practice with its submission of ineligible services and claims has imposed significant administrative burdens on BCBSTX and ultimately resulted in BCBSTX incurring fees and facing IDR awards on ineligible items and services.

## HALOMD BYPASSES CONTROLS INTENDED TO PREVENT SUBMISSION OF INELIGIBLE DISPUTES

207.    Steps taken by government regulators have not slowed down HaloMD's scheme.

208.    For instance, TDI has taken action to prevent the inadvertent submission of ineligible claims to the Texas IDR Process.

209.    For example, TDI modified its portal for the submission of Texas IDRs to require

the entry of the impacted benefit plan's group number. TDI maintains a list of group numbers

where TDI already knows the groups are ineligible for the Texas IDR Process. Entering one of

these group numbers in the portal in an attempt to initiate a Texas IDR stops the Process and returns

the following message that the claim is ineligible:



210.    HaloMD encountered this safeguard and began entering fictitious group numbers

to get around it. Consequently, and despite these warnings, HaloMD continued to initiate disputes

to the Texas IDR Process that it knew were not eligible because (among other things) the claim

was under a self-funded plan not regulated by TDI or subject to SB 1264 in the first place.

211.    Upon information and belief, the TDI has also had direct conversations with

HaloMD regarding the submission of ineligible claims. Specifically, upon information and belief,

TDI met with HaloMD staff, supervisors, the COO, and even Alla LaRoque herself about

HaloMD's practice of submitting huge volumes of ineligible claims to the Texas IDR process.

Upon information and belief, in addition to reviewing data showing HaloMD's ineligible

submissions, TDI provided HaloMD with examples of specific requests that should not have been

submitted to the Texas IDR process and reminded them of HaloMD's obligations to submit only eligible claims and to attest that the claim is eligible with each submission.

212.    Federal regulators have also raised concerns about the volume of ineligible claims being submitted to the Federal IDR. In a joint report recently released by the Departments that run the Federal IDR Process (HHS, Department of Labor, and Department of the Treasury), the Departments noted that the "primary cause of delays in processing disputes" was "determining whether disputes are eligible for the Federal IDR process."[25]

213.    The Departments also "added data elements to the dispute initiation form and directed the parties to attach documents supporting or contesting eligibility during dispute initiation" and "published technical assistance to help disputing parties…better determine eligibility and resolve disputes more expeditiously."[26]

214.    Despite these efforts, HaloMD continues to initiate disputes fraudulently under both the Federal and Texas IDRs, damaging BCBSTX as set forth herein.

215.    Alla and Scott LaRoque caused HaloMD to submit false statements to governmental entities, the entities overseeing the Federal and Texas IDR Processes, and to health plans (such as BCBSTX) to make a service, item, or claim appear eligible when it is not, including but not limited to:

> a.    Misrepresenting that the patient had a health benefit plan administered or insured by BCBSTX;

---

[25] U.S. Centers for Health and Human Services, U.S. Department of Labor, and The Department of the Treasury, *Supplemental Background on Federal Independent Dispute Resolution Public Use Files July 1, 2024 – December 31, 2024*, (May 28, 2025), Available at: www.cms.gov/files/document/federal-idr-supplemental-background-2024-q3-2024-q4.pdf.
[26] *Id.*

a. Misrepresenting the type of health benefit plan applicable to a given service or claim, the group policy number for the relevant health benefit plan, and/or the plan ID for the relevant health benefit plan;

b. Misrepresenting the type of underlying medical service(s) provided;

c. Misrepresenting the date that the underlying medical service(s) were provided;

d. Misrepresenting that the parties participated in an open negotiation period or informal settlement teleconference;

e. Misrepresenting that the provider filed an appeal with the health plan;

f. Attesting the information submitted, inputted, or otherwise provided into the Federal and/or Texas IDR Process portals is accurate when, in fact, it is not; and,

g. Attesting that the "qualified IDR items or services are within the scope of the Federal IDR process," or that "everything you entered [is] true and accurate."

**COUNT I**
**FRAUD**
**(Against All Defendants)**

216.    BCBSTX incorporates by reference as if fully set forth herein the allegations in the preceding paragraphs.

217.    As the examples herein show, HaloMD repeatedly misrepresented material facts regarding the eligibility and information related to the eligibility of claims it submitted to both the Federal and Texas IDR Processes, including entering misinformation into the respective portals and completing and submitting forms. These misrepresentations include but are not limited to the applicable health benefit plan, the dates the underlying medical services were provided, whether certain prerequisites had been satisfied and the dates of the same, the applicability of any "cooling

off" periods, whether the claim was duplicative of a prior dispute, and that the provider filed an appeal with the health plan.

218.    As to the Federal IDR Process, HaloMD further falsely attested in the Notice of Initiation form, described above, that the IDR items or services were "within the scope of the Federal IDR process" when, in fact, they were not.

219.    As to the submissions initiating the Texas IDR Process via the Texas Department of Insurance online portal for thousands of disputes, HaloMD further falsely attested that "everything [HaloMD] entered [is] true and accurate" when, in fact, it was not.

220.    These misrepresentations were made at the direction of Scott LaRoque and Alla LaRoque and a result of their strategy, plan, and scheme.

221.    At the direction of Scott and Alla LaRoque, HaloMD made these misrepresentations directly to BCBSTX, the federal government (HHS, the Department of Labor, and the Department of the Treasury), the Texas Department of Insurance, arbitrators, and IDREs.

222.    HaloMD's misrepresentations were material. But for its misrepresentations, HaloMD would not have been able to initiate Federal or Texas IDRs for ineligible claims and services.

223.    HaloMD made these misrepresentations with the intent of inducing BCBSTX, the federal government (HHS, the Department of Labor, and the Department of the Treasury), the Texas Department of Insurance, arbitrators, and IDREs to rely upon them.

224.    HaloMD intended for BCBSTX to be induced into believe the underlying claims and services in the Federal and Texas IDR Processes to be eligible for those Processes.

225.    Further, HaloMD intended for the entities and individuals overseeing the Federal and Texas IDR Processes—e.g., the federal government (HHS, the Department of Labor, and the

Department of the Treasury), the Texas Department of Insurance, arbitrators, and IDREs—to rely upon HaloMD's misrepresentations, and then take actions that were detrimental to BCBSTX as a result of this reliance. Specifically, HaloMD intended that these entities and individuals allow the Federal and Texas IDR Processes to proceed on ineligible claims, and issue awards on ineligible services and claims.

226.    Had HaloMD not made these misrepresentations, the Federal and Texas IDR Processes would not have proceeded; HaloMD would not have been able to obtain awards for providers on the ineligible claims; and BCBSTX would not have incurred administrative fees, unnecessary overhead costs, and other expenses to manage HaloMD's ineligible Federal and Texas IDRs.

227.    BCBSTX reasonably and justifiably relied upon HaloMD's misrepresentations. HaloMD "delay and dump" tactics prevent BCBSTX from contesting eligibility for many Federal and Texas IDRs. Thus, BCBSTX has to reasonably and justifiably rely upon HaloMD's submission of information and attestations that the underlying services and claims are eligible for the Federal and Texas IDR Processes.

228.    As for the misrepresentations made to the entities and individuals overseeing the Federal and Texas IDR Processes, the federal government (HHS, the Department of Labor, and the Department of the Treasury), the Texas Department of Insurance, arbitrators, and IDREs reasonably and justifiably rely upon HaloMD's submission of information and attestations that the underlying services and claims are eligible for the Federal and Texas IDR Processes. Once the Federal and Texas IDR Processes were allowed to proceed as a result of HaloMD's misrepresentations to third-parties, BCBSTX was forced, by statute, to rely upon HaloMD's misrepresentations and to participate in the Federal and Texas IDR Processes.

229.    HaloMD made these misrepresentations with full knowledge of their falsity or with reckless disregard for the truth. Scott and Alla LaRoque were aware of the statements' falsity as well. HaloMD's knowledge of falsity is illustrated throughout its actions and inactions, which were done at the direction of Scott and Alla LaRoque, including but not limited to the following:

230.    HaloMD has the relevant information available to it, such as the type of health plan and the date the services were rendered. HaloMD submits and attests to the accuracy of completely different information so that it is able to initiate the Federal and Texas IDR Processes.

231.    HaloMD touts itself as an expert in the Federal and Texas IDR Processes, and publicly represents that it "assesses each case for eligibility under the No Surprises Act and relevant state regulations." HaloMD therefore knows and understands that the claims it is initiating disputes on are ineligible.

232.    HaloMD has initiated thousands of disputes in both the Federal and Texas IDR Processes for the same service, when a service can only inherently be ineligible for one or the other.

233.    HaloMD bulk batches the submission of claims for the Federal and Texas IDR Processes to limit BCBSTX's ability to contest eligibility of the ineligible claims that it is initiating disputes on.

234.    When the portal for initiating disputes in the Texas IDR Process started requiring input of certain information, including the applicable group numbers, HaloMD entered fictious or inaccurate group numbers so it could initiate ineligible disputes.

235.    As a direct and proximate result of these misrepresentations, HaloMD, at the direction of Alla and Scott LaRoque, caused BCBSTX to suffer damages in an amount to be proven at trial, including without limitation: Federal and Texas IDR awards fraudulently procured against

BCBSTX by HaloMD for ineligible claims; administrative fees and costs imposed on BCBSTX as part of the Federal and Texas IDR Processes; and costs for the overhead and resources necessary for BCBSTX to respond to Federal and Texas IDR Processes initiated by HaloMD for ineligible claims.

**COUNT II**
**NEGLIENT MISREPRESENTATION**
**(Against All Defendants)**

236.    BCBSTX incorporates by reference as if fully set forth herein the allegations in the preceding paragraphs.

237.    As the examples herein show, HaloMD repeatedly negligently misrepresented material facts regarding the eligibility and information related to the eligibility of claims it submitted to both the Federal and Texas IDR Processes, including entering misinformation into the respective portals and completing and submitting forms. These misrepresentations include but are not limited to the applicable health benefit plan, the dates the underlying medical services were provided, whether certain prerequisites had been satisfied, whether the claim was duplicative of a prior dispute, and that the provider filed an appeal with the health plan.

238.    As to the Federal IDR Process, HaloMD further negligently misrepresented in the Notice of Initiation form, described above, that the IDR items or services were "within the scope of the Federal IDR process" when, in fact, they were not.

239.    As to the submissions initiating the Texas IDR Process via the Texas Department of Insurance online portal for thousands of disputes, HaloMD further negligently misrepresented that "everything [HaloMD] entered [is] true and accurate" when, in fact, it was not.

240.    These misrepresentations were made at the direction of Scott and Alla LaRoque and a result of their strategy, plan, and scheme.

241.    At the direction of Scott and Alla LaRoque, HaloMD made these misrepresentations directly to BCBSTX, the federal government (HHS, the Department of Labor, and the Department of the Treasury), the Texas Department of Insurance, arbitrators, and IDREs.

242.    HaloMD's negligent misrepresentations were concerning existing, material facts. But for its misrepresentations, HaloMD would not have been able to initiate Federal or Texas IDRs for ineligible claims.

243.    Had HaloMD not made these misrepresentations, the Federal and Texas IDR Processes would not have proceeded; HaloMD would not have been able to obtain awards on the ineligible claims; and BCBSTX would not have incurred administrative fees, unnecessary overhead costs, and other expenses to manage HaloMD's ineligible Federal and Texas IDRs.

244.    HaloMD made these negligent misrepresentations in the course of its business and failed to exercise reasonable care or competence in obtaining or communicating the information. Scott and Alla LaRoque were aware of the statements' falsity as well. HaloMD's knowledge of falsity is illustrated throughout its actions and inactions, which were done at the direction of Scott LaRoque and Alla LaRoque, including but not limited to the following:

245.    HaloMD has the relevant information available to it, such as the type of health plan and the date the services were rendered. HaloMD submits and attests to the accuracy of completely different information so that it is able to initiate the Federal and Texas IDR Processes.

246.    HaloMD touts itself as an expert in the Federal and Texas IDR Processes, and publicly represents that it "assesses each case for eligibility under the No Surprises Act and relevant state regulations." HaloMD therefore knows and understands that the claims it is initiating disputes on are ineligible.

247.    HaloMD has initiated thousands of disputes in both the Federal and Texas IDR Processes for the same service, when a service can only inherently be ineligible for one or the other.

248.    HaloMD bulk batches the submission of claims for the Federal and Texas IDR Processes to limit BCBSTX's ability to contest eligibility of the ineligible claims that it is initiating disputes on.

249.    When the portal for initiating disputes in the Texas IDR Process started requiring input of certain information, including the applicable group numbers, HaloMD entered fictious or inaccurate group numbers so it could initiate ineligible disputes.

250.    BCBSTX justifiably relied upon HaloMD's negligent misrepresentations.

251.    BCBSTX reasonably and justifiably relied upon HaloMD's misrepresentations. BCBSTX is unable to contest eligibility on all of the Federal and Texas IDR Processes initiated by HaloMD because, in part, of the "delay and dump" tactics discussed herein. Thus, BCBSTX has to reasonably and justifiably rely upon HaloMD's submission of information and attestations that the underlying services and claims are eligible for the Federal and Texas IDR Processes.

252.    As for the misrepresentations made to the entities and individuals overseeing the Federal and Texas IDR Processes, the federal government (HHS, the Department of Labor, and the Department of the Treasury), the Texas Department of Insurance, arbitrators, and IDREs reasonably and justifiably rely upon HaloMD's submission of information and attestations that the underlying services and claims are eligible for the Federal and Texas IDR Processes. Once the Federal and Texas IDR Processes were allowed to proceed as a result of HaloMD's misrepresentations to third-parties, BCBSTX was forced, by statute, to rely upon HaloMD's misrepresentations and to participate in the Federal and Texas IDR Processes.

- 60 -

253.     As a direct and proximate result of these misrepresentations, HaloMD, at the direction of Alla LaRoque and Scott LaRoque, caused BCBSTX to suffer damages in an amount to be proven at trial, including without limitation: Federal and Texas IDR awards fraudulently procured against BCBSTX by HaloMD for ineligible claims; administrative fees and costs imposed on BCBSTX as part of the Federal and Texas IDR Processes; and forcing BCBSTX to bear the costs of the overhead and resources necessary to respond to Federal and Texas IDR Processes initiated by HaloMD for ineligible claims.

## COUNT III
## FRAUDULENT INDUCEMENT
### (Against All Defendants)

254.     BCBSTX incorporates by reference as if fully set forth herein the allegations in the preceding paragraphs.

255.     At the direction of Alla and Scott LaRoque, HaloMD submitted false and inaccurate information regarding the eligibility and information related to the eligibility of services for the Federal and Texas IDR Processes.

256.     These misrepresentations include but are not limited to the applicable health benefit plan, the dates the underlying medical services were provided, whether certain prerequisites to eligibility for the Federal or Texas IDR Processes had been satisfied, whether the service was duplicative of a prior dispute, and that the provider filed an appeal with the health plan.

257.     In the case of Federal IDR initiations, HaloMD further falsely attested, at the direction of Alla and Scott LaRoque, that IDR items or services were "within the scope of the Federal IDR process" when, in fact, they were not.

258.    In the case of Texas IDR initiations, HaloMD further falsely attested, at the direction of Alla and Scott LaRoque, that "everything [HaloMD] entered [is] true and accurate" when, in fact, it was not.

259.    At the direction of Alla and Scott LaRoque, HaloMD made these fraudulent misrepresentations to BCBSTX, the federal government (HHS, the Department of Labor, and the Department of the Treasury), the Texas Department of Insurance, arbitrators, and IDREs.

260.    These misrepresentations allowed HaloMD to formally initiate the Federal and Texas IDR Processes.

261.    HaloMD, Alla and Scott LaRoque intended that its false misrepresentations, and formal initiation of the Federal and Texas IDR Processes would be transmitted to BCBSTX, and that BCBSTX would act and rely on the misrepresentations.

262.    Had HaloMD not made these misrepresentations, the Federal and Texas IDR Processes would not have proceeded; HaloMD would not have been able to obtain awards on the ineligible claims; and BCBSTX would not have incurred administrative fees, unnecessary overhead costs, and other expenses to manage HaloMD's ineligible Federal and Texas IDRs.

263.    BCBSTX reasonably and justifiably relied upon HaloMD's misrepresentations. BCBSTX is unable to contest eligibility on all of the Federal and Texas IDR Processes initiated by HaloMD because, in part, of the "delay and dump" tactics discussed herein. Thus, BCBSTX has to reasonably and justifiably rely upon HaloMD's submission of information and attestations that the underlying services and claims are eligible for the Federal and Texas IDR Processes.

264.    As for the misrepresentations made to the entities and individuals overseeing the Federal and Texas IDR Processes, the federal government (HHS, the Department of Labor, and the Department of the Treasury), the Texas Department of Insurance, arbitrators, and IDREs

reasonably and justifiably rely upon HaloMD's submission of information and attestations that the underlying services and claims are eligible for the Federal and Texas IDR Processes. Once the Federal and Texas IDR Processes were allowed to proceed as a result of HaloMD's misrepresentations to third-parties, BCBSTX was forced, by statute, to rely upon HaloMD's misrepresentations and to participate in the Federal and Texas IDR Processes.

265.    This induced BCBSTX to proceed through the Federal and Texas IDR Processes on ineligible claims.

266.    This further induced BCBSTX to settle with HaloMD on certain ineligible claims submitted into the Federal and Texas IDR Processes.

267.    But for HaloMD's misrepresentations, made at Alla and Scott LaRoque's direction, BCBSTX would not have been fraudulently induced to take these acts. Indeed, there would be no ineligible Federal or Texas IDRs initiated but for HaloMD's misrepresentations.

268.    Moreover, BCBSTX would not have settled or otherwise engaged in negotiations on ineligible claims but for HaloMD's misrepresentations that such claims were eligible for the Federal and Texas IDR Processes.

269.    As a direct and proximate result of these misrepresentations, HaloMD, at the direction of Alla and Scott LaRoque, caused BCBSTX to suffer damages in an amount to be proven at trial, including without limitation: Federal and Texas IDR awards fraudulently procured against BCBSTX by HaloMD for ineligible claims; settling claims under the false veneer of those claims being eligible for the Federal or Texas IDR Processes; administrative fees and costs imposed on BCBSTX as part of the Federal and Texas IDR Processes; and forcing BCBSTX to bear the costs of the overhead and resources necessary to respond to Federal and Texas IDR Processes initiated by HaloMD for ineligible claims.

## COUNT IV
## MONEY HAD AND RECEIVED
## <u>(Against Defendant HaloMD)</u>

270.     BCBSTX incorporates by reference as if fully set forth herein the allegations in

the preceding paragraphs.

271.     HaloMD caused BCBSTX to wrongfully pay providers for improper awards

and/or settlements related to claims that are ineligible for the Federal and Texas IDR Processes.

272.     HaloMD received a portion of these payments from the providers.

273.     BCBSTX would not have paid those claims but for the wrongful conduct of

HaloMD, as described herein.

274.     The funds paid by BCBSTX for improper IDR awards should be returned in good

conscience. Accordingly, BCBSTX seeks the return of money had and received by HaloMD due

to HaloMD's improper and fraudulent conduct.

## COUNT V
## VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
## ACT ("RICO") – HaloMD Enterprise
## <u>(Against Defendants Alla LaRoque and Scott LaRoque)</u>

275.     BCBSTX incorporates by reference as if fully set forth herein the allegations in the

preceding paragraphs.

276.     Alla LaRoque and Scott LaRoque violated 18 U.S.C. § 1962(c) because they are

associated with the HaloMD Enterprise, which engaged in and affected interstate commerce, and

Alla LaRoque and Scott LaRoque conducted or participated, directly or indirectly, in the conduct

of the HaloMD Enterprise's affairs through a pattern of racketeering activities, *e.g.*, violations of

18 U.S.C. § 1343 (Wire Fraud).

*The HaloMD Enterprise*

277.    The HaloMD Enterprise constitutes an enterprise under 18 U.S.C. § 1961(4) because HaloMD is a legal entity—a limited liability company—created pursuant to Delaware's laws.

278.    The HaloMD Enterprise was engaged in, and its activities affected, interstate commerce because it submits claims from providers from various states to the Federal IDR and state equivalents.

*RICO Persons*

279.    Alla LaRoque is a "person" under 18 U.S.C. § 1961(3) and is distinct from the HaloMD Enterprise. Alla LaRoque is associated with the HaloMD Enterprise because she helped to create and is a beneficial owner of HaloMD, and participated in, aided, and furthered the HaloMD Enterprise by funding its creation and overseeing its operations, including directing its strategies with regards to the Federal and Texas IDR Processes and the representations being made to health benefit plans, individuals, entities overseeing the Texas and Federal IDR Processes, and state and federal governmental bodies. Alla LaRoque participated in the operation and management of the HaloMD Enterprise through a pattern of racketeering acts, including violations of 18 U.S.C. § 1343 (wire fraud).

280.    Scott LaRoque is a "person" under 18 U.S.C. 1961(3) and is distinct from the HaloMD Enterprise. Scott LaRoque is associated with the HaloMD Enterprise because he helped to create and is a beneficial owner of HaloMD, and participated in, aided, and furthered the HaloMD Enterprise by funneling HaloMD business through the connections, ventures, and relationships he established as part of a company he previously founded, MPowerHealth. Scott LaRoque participated in the operation and management of the HaloMD Enterprise through a pattern of racketeering acts, including violations of 18 U.S.C. § 1343 (wire fraud).

281.    Because of Alla and Scott LaRoque's work participating in, establishing, managing, orchestrating, leading, and maintaining the HaloMD Enterprise and the related illicit arrangements, Alla and Scott LaRoque committed tens of thousands of acts of wire fraud through the HaloMD Enterprise: one for each time a fraudulent attestation or inaccurate information was transmitted via electronic wire to a payor, entity overseeing the Texas and/or Federal IDR Processes, or governmental entity, including the HaloMD Enterprise knowingly submitting ineligible submissions into the Federal and Texas IDR Processes through online portals.

### Pattern of Racketeering Activities

282.    Alla and Scott LaRoque, intentionally and knowingly conducted and participated, directly and indirectly, in the conduct of the HaloMD Enterprise's affairs through repeated, related violations of 18 U.S.C. § 1343 (Wire Fraud). But for the fraudulent attestations, inaccurate information, and knowing submission of ineligible claims into the Federal and Texas IDR Processes, the purpose of the HaloMD Enterprise—obtaining money from payers for disputes regarding ineligible services, items, or claims—could not have been accomplished.

283.    Alla and Scott LaRoque were essential participants in the scheme to defraud BCBSTX that was executed through the HaloMD Enterprise.

284.    Scott LaRoque developed a web of out-of-network neuromonitoring providers affiliated with MPowerHealth—which was essential to getting HaloMD the volume needed for the HaloMD Enterprise's scheme to significantly scale its claims submissions.

285.    Alla LaRoque funded, founded, and created HaloMD, which was essential to the submission of fraudulent attestations, inaccurate information, and ineligible submissions into the Federal and Texas IDR Processes.

*Violations of 18 U.S.C. § 1343 (Wire Fraud)*

286.    Alla and Scott LaRoque knowingly and intentionally devised and executed a scheme to defraud BCBSTX by means of false or fraudulent pretenses, representations, or promises, which involved and was furthered by transmitting writings via interstate wire communication networks which were designed and intended to defraud BCBSTX. This includes inputting information related to disputed services, items, or claims under the Federal and Texas IDR Processes' portals and the submission of attestations and certifications related to the disputed services, items, or claim's eligibility for the Federal and Texas IDR Processes.

287.    Alla and Scott LaRoque devised a scheme to unlawfully obtain money from BCBSTX by using the HaloMD Enterprise to obtain awards against BCBSTX in the Federal and Texas IDR Processes for ineligible services, items, or claims for which no award should have been rendered against BCBSTX.

288.    The HaloMD Enterprise's purpose was to enrich Alla and Scott LaRoque at the expense of BCBSTX by fraudulently inducing and compelling BCBSTX to pay exorbitant amounts for services that were not eligible for the Federal and Texas IDR Processes. Alla and Scott LaRoque achieved this through the HaloMD Enterprise by leveraging volume to overwhelm IDREs, arbitrators, BCBSTX, and other similarly situated health plans to obtain inflated awards for ineligible services, items, or claims by making false certifications concerning the services, items, and/or claims' eligibility.

289.    The HaloMD Enterprise's scheme worked as follows: First, Scott LaRoque set the stage by creating MPowerHealth, establishing relationships with other out-of-network providers, and noticing the financial gains that could be realized through out-of-network billing. Then, Alla LaRoque funded and created HaloMD, for the sole purpose of submitting disputes into the Federal and Texas IDR Processes on behalf of providers to which Scott LaRoque developed relationships

and business ventures with. HaloMD then adopted a practice of stockpiling claim information for services a provider submitted to a health plan. Next:

    a. ***False statements.*** Alla and Scott LaRoque cause HaloMD to submit false attestations in the open negotiations period and false certifications to the Federal and/or Texas IDR Processes regarding the services, items, and/or claims' eligibility for the respective Process.

    b. ***Strategic overwhelm.*** Then, Alla and Scott LaRoque cause HaloMD to use its stockpiles to submit massive numbers of open negotiations and Federal and/or Texas IDR initiations all at once, intending to overwhelm the respective IDR system, as well as the health plan's ability to meaningfully respond or contest eligibility.

    c. ***Artificially inflated offers***. Alla and Scott LaRoque cause HaloMD to submit artificially inflated offers—sometimes higher than the actual amount charged for the services, and often *significantly* higher than the median in-network rate for the same item or service—to the Federal or Texas IDR. The IDRs are baseball style arbitrations, which means where the IDRE or arbitrators believe the services, items, or claims are eligible for the Process, the IDRE or arbitrator always selects one of the two offers; there is no compromise.

290.    Alla and Scott LaRoque cause the HaloMD Enterprise to submit false statements to governmental entities, the entities overseeing the Federal and Texas IDR Processes, and to health plans (such as BCBSTX) to make a service, item, or claim appear eligible (when it is not). Each step—initiating out-of-network payment disputes with false statements or certifications, flooding the system with massive batches to overwhelm the health plan (and the IDREs), and

making artificially inflated offers to try to reap a windfall in a no-compromises situation—involved transmitting writings via interstate wire communication networks, writings which were designed and intended to defraud BCBSTX. For example, in the context of the Federal IDR Process, in some instances:

    a.  HaloMD was only able to procure awards by commencing open negotiations under the Federal IDR Process via written notice—which would occur via email to payors (such as BCBSTX);

    b.  HaloMD was only able to procure awards in the Federal IDR Process by inputting false information regarding the underlying services, items, or claims into an online portal created by the U.S. Department of Health & Human Services—which was transmitted over wires to payors (such as BCBSTX) and IDREs;

    c.  HaloMD was only able to procure awards in the Federal IDR Process by falsely attesting that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process"—which was transmitted over wires to payors (such as BCBSTX) and IDREs;

291.    HaloMD also took these steps in the context of the Texas IDR Process; that is, initiating out-of-network payment disputes with false statements or certifications, flooding the system with massive batches to overwhelm the health plan (and the arbitrators), and making artificially inflated offers to try to reap a windfall in a no-compromises situation, which involved transmitting writings via interstate wire communication networks, writings which were designed and intended to defraud BCBSTX. For example, in the context of the Texas IDR Process, in some instances:

a.  HaloMD was only able to procure awards by commencing informal settlement teleconferences under the Texas IDR Process—which would typically be initiated via email to payors (such as BCBSTX);

b.  HaloMD was only able to procure awards in the Texas IDR Process by inputting false information regarding the underlying services, items, or claims into an online portal created by the TDI—which was transmitted over wires to payors (such as BCBSTX) and arbitrators; and,

c.  HaloMD was only able to procure awards in the Texas IDR Process by falsely attesting that "everything" inputted into the TDI portal was "true and accurate[.]"

292.  Alla and Scott LaRoque knowingly and intentionally designed and executed the HaloMD Enterprise scheme to defraud by means of false or fraudulent pretenses, representations, or promises, which involved and was furthered by transmitting writings via interstate wire communication networks which were designed and intended to defraud BCBSTX.

293.  Alla LaRoque was integral to this fraudulent scheme because she devised the scheme, funded the scheme's creation, held herself out as an expert in the Texas and Federal IDR Processes, implemented the infrastructure and policies for the scheme to be carried out, and oversaw the scheme's execution.

294.  Scott LaRoque was integral to this fraudulent scheme because he devised the scheme, created relationships with out-of-network providers necessary to give the scheme volume, funded the scheme's creation, implemented the infrastructure and policies for the scheme to be carried out, and oversaw the scheme's execution.

295.  HaloMD, the company Alla and Scott LaRoque founded and are beneficial owners of, was integral to this fraudulent scheme because it initiated disputes on behalf of providers, made

false statements and misrepresentations regarding the services that these providers rendered, procured awards in the Texas and Federal IDR Processes for ineligible services, and pocketed a portion of those awards as a contingency fee.

296.    Alla and Scott LaRoque knowingly and intentionally caused the use of interstate wire communication networks to execute the scheme to defraud. A natural, necessary, and foreseeable consequence of the scheme to defraud was the electronic transmission, via interstate wire communication networks, of intentionally false, fraudulent, and misleading submissions and certifications. Each submission listed in this pleading was transmitted via interstate wire, in furtherance of this scheme to defraud, and constitutes a separate violation of 18 U.S.C. § 1343.

*Pattern*

297.    These repeated, related violations of 18 U.S.C. § 1343 constitute a pattern of racketeering activity, under 18 U.S.C. § 1961(5).

298.    Alla and Scott LaRoque began to use the HaloMD Enterprise to commit racketeering acts in or around January 2022, and have continued to the present. During this multi-year period, Alla and Scott LaRoque committed thousands of racketeering acts through the HaloMD Enterprise, which were not isolated incidents, but were separate, yet interrelated, acts forming a systematic and ongoing pattern.

299.    The racketeering acts were related because they had the same or similar *purposes* (obtaining money that the HaloMD Enterprise was not entitled to—namely, awards in the Federal and Texas IDR Processes for ineligible services), *results* (harming BCBSTX, its plans, and its members), *participants* (Alla and Scott LaRoque, acting through their company, HaloMD, acting on behalf of the similar groups of underlying out-of-network providers), *victims* (commercial payors, like BCBSTX, its plans, and its members), and *methods of commission* (flooding the Federal and Texas IDR Processes with ineligible disputes by falsely certifying that the services,

items, and/or claims were eligible for the respective IDR Process, and submitting artificially inflated offers to receive a windfall in any dispute for which it prevailed).

300.    Collectively, the thousands of violations of 18 U.S.C. § 1343, committed over this multi-year period, constitute both a closed-ended and open-ended continuity pattern of racketeering activity.

301.    The racketeering activities are central to the way that Alla and Scott LaRoque operate and manage the HaloMD Enterprise's business affairs and thus constitute a threat to continue in the future either through the HaloMD Enterprise or other enterprises that would take advantage of the same structures. There is no shortage of other participants willing to engage in similarly structured patterns of illegal conduct, as evidenced by the sheer number of disputes being initiated by providers, which the CMS has reported.[27] This particular pattern of racketeering activity is so durable and repetitive that it carries with it an implicit threat of continued criminal activity in the future.

### RICO Injury

302.    As a direct and proximate result of these racketeering activities and violations of 18 U.S.C. § 1343, and under 18 U.S.C. § 1964(c), BCBSTX has been injured in its business and property by paying tens of millions in ineligible awards for services, items, and/or claims that were not legitimately eligible for Federal or Texas IDR Processes, but were submitted to the respective Process because of the racketeering acts Alla and Scott LaRoque used the HaloMD Enterprise to commit.

---

[27] *See* Centers for Medicare & Medicaid Services, "Federal IDR PUF for 2024 Q1 (as of March 18, 2025)," https://www.cms.gov/nosurprises/policies-and-resources/reports (showing 947,209 items/services submitted in the fourth quarter of 2024, of which over 99% (947,135) were initiated by health care providers or facilities) (analysis excluding the six items/services for which the "Item or Service Description" field contain an "error").

303.    BCBSTX is entitled to recover threefold the damage it sustained because of this conduct, as well as its reasonable attorneys' fees and costs.

**COUNT VI**
**VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS**
**ACT ("RICO") – Out-of-Network Provider Enterprise**
**(Against All Defendants)**[28]

304.    BCBSTX incorporates by reference as if fully set forth herein the allegations in the preceding paragraphs.

305.    Alla LaRoque, Scott LaRoque, HaloMD, and the out-of-network providers ("OON Providers") that contracted with HaloMD supplied data regarding (both eligible and ineligible) services, items, and/or claims for HaloMD to submit to the Federal and Texas IDR Processes and formed an associated-in-fact enterprise (hereinafter, the "Out of Network Provider Enterprise," or "OON Enterprise"), which engaged in and affected interstate commerce. In doing so, Alla LaRoque, Scott LaRoque, and HaloMD violated 18 U.S.C. § 1962(c) because they conducted or participated, directly or indirectly, in the conduct of the OON Enterprise's affairs through a pattern of racketeering activities, e.g., violations of 18 U.S.C. § 1343 (Wire Fraud).

*The OON Enterprise*

306.    Alla LaRoque, Scott LaRoque, HaloMD, and the OON Providers who contracted with HaloMD formed the "OON Enterprise," as that term is defined in 18 U.S.C. § 1961(4), for the purposes of stealing and defrauding funds from BCBSTX through the fraudulent submission of ineligible services, items, and/or claims and inflated settlement demands under the Federal and Texas IDR Processes.

---

[28] Federal Rule of Civil Procedure 8(d)(2) permits a plaintiff to plead claims in the alternative.

307.    The OON Enterprise members have a common purpose: to enrich themselves at the expense of BCBSTX by fraudulently inducing and compelling BCBSTX to pay exorbitant amounts for services, items, and/or claims that were not eligible for the Federal and Texas IDR Processes. The OON Enterprise achieved this by leveraging volume to overwhelm IDREs, arbitrators, BCBSTX, and other similarly situated health plans, as well as making artificially inflated settlement demands, to improperly obtain awards for ineligible services, items, and/or claims, by making false certifications concerning the services, items, and/or claims' eligibility.

308.    The OON Enterprise members maintain relationships and links that allow them to achieve their shared purpose more effectively and successfully together than they ever could have done independently. Scott LaRoque uses MPOWER to generate opportunities for out-of-network providers to perform out-of-network services that could potentially be eligible for IDR. The OON Providers are connected to HaloMD and Alla LaRoque by Scott LaRoque, and then contract to have HaloMD perform its marketed turn-key, AI-driven IDR revenue stream service, promising to maximize revenue for the OON Providers through the IDR Processes. HaloMD leverages information from the OON Providers—for example, medical records and notes—to put together IDR submissions that are more likely to win the IDR dispute. HaloMD also leverages the volume of the OON Providers to group together submissions and drop them on the IDREs/arbitrators (and payors, such as BCBSTX) in batches that make identifying ineligible submissions impossible (or significantly more difficult). When the IDREs/arbitrators subsequently find in favor of a member of the OON Enterprise (based primarily on HaloMD's false representations), and then select HaloMD's inflated settlement demand as the award amount, HaloMD keeps a portion of the awards, and then uses some of that money to further enhance its industrial scale capabilities to flood the Process so that the OON Enterprise members can continue to profit from awards for

ineligible disputes; and inevitably, some of the money flows directly into the pockets of HaloMD's owners, Alla LaRoque and Scott LaRoque. These financial ties and coordinated activities have now gone on for more than one year, and the OON Enterprise has had sufficient longevity to see through multiple cycles of services performed, ineligible disputes submitted *en masse*, inflated settlement demands submitted, and improper awards received, which are necessary to achieve its members' common purpose.

309.    The OON Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein—namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of wire fraud (i.e., the submission of the ineligible disputes to BCBSTX through the IDR Processes and making inflated settlement demands in those Processes), by creating and maintaining records, negotiating and executing various agreements, and maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the award proceeds.

### *RICO Persons*

310.    HaloMD is a "person" under 18 U.S.C. § 1961(3) because it is an entity registered to do business in Texas. It is associated with the OON Enterprise because it submits OON Provider's services, items, and/or claims to the Federal and/or Texas IDR Processes in pursuit of the OON Enterprise's scheme.

311.    Alla LaRoque is a "person" under 18 U.S.C. § 1961(3) and is distinct from the OON Enterprise. Alla LaRoque is associated with the OON Enterprise because she helped create it, is a beneficial owner of it, and participated in, aided, and furthered the OON Enterprise by funding its creation and overseeing its operations, including directing its strategies with regards to the Texas

and Federal IDR Processes and the representations being made to payors, individuals and entities overseeing the Texas and Federal IDR Processes, and state and federal governmental bodies. Alla LaRoque participated in the operation and management of the OON Enterprise through a pattern of racketeering acts, including violations of 18 U.S.C. § 1343 (wire fraud).

312.    Scott LaRoque is a "person" under 18 U.S.C. 1961(3) and is distinct from the OON Enterprise. Scott LaRoque is associated with the HaloMD Enterprise because he helped create it, is a beneficial owner of it, and participated in, aided, and furthered the OON Enterprise by funding its creation and overseeing its operations, including directing its strategies with regards to the Texas and Federal IDR Processes and the representations being made to payors, individuals and entities overseeing the Texas and Federal IDR Processes, and state and federal governmental bodies. Scott LaRoque participated in the operation and management of the OON Enterprise through a pattern of racketeering acts, including violations of 18 U.S.C. § 1343 (wire fraud).

313.    Defendants Alla LaRoque, Scott LaRoque, and HaloMD all participated, directly or indirectly, in the establishment, management, orchestration, and maintenance of the OON Enterprise to commit thousands of acts of wire fraud—one each time they used the OON Enterprise to submit a dispute into the Federal and Texas IDR Processes for services, items, and/or claims that were ineligible, disputes which proceeded through the respective Process because of false information and attestations transmitted by interstate wire.

314.    At all material times, the OON Enterprise was engaged in, and its activities affected, interstate commerce because HaloMD initiates Texas and Federal IDR Processes for providers located across the county. The OON Enterprise also received funds from procuring awards against managed care companies and plan sponsors located across the country, including in Texas and Illinois.

*Pattern of Racketeering Activities*

315.    Alla LaRoque, Scott LaRoque, HaloMD, and the OON Providers who contracted with HaloMD intentionally and knowingly conducted and participated, directly and indirectly, in the conduct of the OON Enterprise's affairs through repeated related violations of 18 U.S.C. § 1343 (Wire Fraud). Each were essential participants in the scheme to defraud BCBSTX that was executed through the OON Enterprise. Alla LaRoque, Scott LaRoque, and HaloMD were essential participants in the scheme to defraud BCBSTX that was executed through the OON Enterprise. But for the fraudulent attestations, inaccurate information, and knowing submission of ineligible claims into the Federal and Texas IDR Processes, the purpose of the OON Enterprise—obtaining money from payers for disputes regarding ineligible services, items, or claims—could not have been accomplished.

316.    Alla LaRoque, Scott LaRoque, and HaloMD were essential participants in the scheme to defraud BCBSTX that was executed through the OON Enterprise.

317.    Scott LaRoque developed a web of out-of-network neuromonitoring providers affiliated with MPowerHealth—which was essential to getting HaloMD the volume needed for the HaloMD Enterprise's scheme to significantly scale its claims submissions.

318.    Alla LaRoque funded, founded, and created HaloMD, which was essential to the submission of fraudulent attestations, inaccurate information, and ineligible submissions into the Federal and Texas IDR Processes.

319.    HaloMD executed the scheme by submitting fraudulent attestations, inaccurate information, and ineligible submissions into the Federal and Texas IDR Processes.

*Violations of 18 U.S.C. § 1343 (Wire Fraud)*

320.    Alla LaRoque, Scott LaRoque, and HaloMD knowingly and intentionally designed and executed a scheme to defraud by means of false or fraudulent pretenses, representations, or

promises, which involved and was furthered by transmitting writings via interstate wire communication networks which were designed and intended to defraud BCBSTX.

321.    The OON Enterprise was established to reap funds from BCBSTX and other payors through a pattern of fraudulent misrepresentations in the Texas and Federal IDR Processes. The Enterprise worked to deceive payors like BCBSTX into needlessly paying awards for disputes related to services, items, or claims that were ineligible for the Federal and/or Texas IDR Processes by means of fraud perpetrated over the wires.

322.    The OON Enterprise members' predicate acts of racketeering—which began no later than at least January of 2022, and have occurred continuously and systematically through the present day—committed by interstate wires, include: submitting disputes through the online Federal and Texas IDR Process portals that were for services, items, or claims that were ineligible for the respective IDR Process; attesting to false statements; initiating hundreds of disputes at the same time and in such a way as to make it impossible for BCBSTX to reasonably identify and object to all ineligible disputes; demanding outrageous settlement payments far in excess of the provider's initial charges, much less a commercially reasonable amount; engaging in the Federal and Texas IDR Processes in bad faith; and procuring payments from BCBSTX on services, items, and/or claims that were ineligible for the Federal and Texas IDR Processes via interstate wire. The fraudulent submissions used to obtain awards against BCBSTX comprise, in part, the pattern of racketeering activity identified through the date of this Complaint, and are described above in particular detail.

323.    These predicate acts of wire fraud occurred regularly since approximately January 2022, and included electronic communication relating to the Federal and Texas IDR Processes.

324.    Alla LaRoque, Scott LaRoque, and HaloMD each played a distinct and indispensable role, and the participants joined as a group to execute the scheme and further the OON Enterprise's goals.

325.    Scott LaRoque was integral to this fraudulent scheme because he devised the scheme, funded the scheme's creation, held himself out as an expert in the Texas and Federal IDR Processes, implemented the infrastructure and policies for the scheme to be carried out, and oversaw the scheme's execution.

326.    Alla LaRoque was integral to this fraudulent scheme because she devised the scheme, funded the scheme's creation, held herself out as an expert in the Texas and Federal IDR Processes, implemented the infrastructure and policies for the scheme to be carried out, and oversaw the scheme's execution.

327.    HaloMD was integral to this fraudulent scheme because it initiated disputes on behalf of providers; made false statements and misrepresentations regarding the services that these providers rendered; procured awards in the Texas and Federal IDR Processes for services, items, and/or claims that were ineligible for the respective IDR Process; and pocketed a portion of those awards as a contingency.

328.    The OON Enterprise could not have succeeded, and its members could not have enjoyed the substantial financial benefits described above, absent their coordinated efforts. The members of the OON Enterprise functioned as a unit in pursuit of their common purpose.

329.    Alla LaRoque, Scott LaRoque, and HaloMD knowingly and intentionally caused the use of interstate wire communication networks to execute the scheme to defraud. A natural, necessary, and foreseeable consequence of the scheme to defraud was the electronic transmission, via interstate wire communication networks, of intentionally false, fraudulent, and misleading

submissions to the Texas and Federal IDR Processes. Each submission listed in this pleading was transmitted via interstate wire, in furtherance of this scheme to defraud, and constitutes a separate violation of 18 U.S.C. § 1343.

330.    The OON Enterprise received payment for the fraudulent claims from BCBSTX (in the form of contingency fees HaloMD received) through the interstate wire facilities, in violation of 18 U.S.C. § 1343. Each such payment constituted a separate wire fraud violation. Each of these violations was related because they shared the common purpose of defrauding BCBSTX. BCBSTX suffered injuries every time they paid for a dispute that was ineligible for the Texas and/or Federal IDR Processes, losing many millions of dollars as a result of the OON Enterprise's racketeering activity.

331.    The OON Enterprise profited substantially from the enterprise, ultimately receiving many tens of millions from BCBSTX. The OON Enterprise further damaged BCBSTX by forcing BCBSTX to incur needless administrative costs and overhead expenses.

332.    The relationships between the members of the OON Enterprise extended beyond the unlawful predicate acts at issue in this case. In particular, some portion of the Federal IDR disputes generated by the OON Enterprise and submitted to BCBSTX were not ineligible for the Federal IDR Process (and similarly, some portion of the Texas IDR disputes generated by the OON Enterprise and submitted to BCBSTX were not ineligible for the Texas IDR Process). The illegal scheme at issue in this litigation was and is distinct from any legitimate business activities undertaken by the members of the OON Enterprise.

### *The Pattern*

333.    These repeated, related violations of 18 U.S.C. § 1343, constitute a pattern of racketeering activity, under 18 U.S.C. § 1961(5).

334.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

335.    The OON Enterprise members began to use the OON Enterprise to commit racketeering acts in or around January 2022, and have continued to the present day. During this multi-year period, the OON Enterprise members committed thousands of racketeering acts, which were not isolated incidents, but were separate, yet interrelated, acts forming a systematic and ongoing pattern.

336.    The racketeering acts were related because they had the same or similar *purposes* (obtaining money that the OON Enterprise member were not entitled to—namely awards for ineligible services), *results* (harming BCBSTX, its plans, and its members), *participants* (the OON Enterprise members), *victims* (commercial payors, like BCBSTX, its plans, and members), and *methods of commission* (flooding the Federal and Texas IDR Processes with ineligible disputes by falsely certifying that the services, items, and/or claims were eligible for the respective IDR Process, and submitting artificially inflated offers to receive a windfall in any dispute for which it prevailed).

337.    Collectively, the thousands of violations of 18 U.S.C. § 1343, committed over this multi-year period, constitute both a closed-ended and open-ended continuity pattern of racketeering activity.

### *RICO Injury*

338.    As a direct and proximate result of these racketeering activities and violations of 18 U.S.C. § 1343, and under 18 U.S.C. § 1964(c), BCBSTX has been injured in its business and

████████

property by paying tens of millions in awards, overhead, and administrative fees on ineligible services, items, and/or claims.

339.    BCBSTX is entitled to treble damages and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT VII**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(Against All Defendants)**

340.    BCBSTX incorporates by reference as if fully set forth herein the allegations in the preceding paragraphs.

341.    BCBXTX seeks a declaration that Defendants' conduct in submitting false attestations and initiating Federal and State IDR Processes for ineligible IDR claims, items, or services is unlawful. BCBSTX additionally seeks a declaration that IDR awards for such ineligible IDR claims, items, or services are not binding. It further seeks an injunction prohibiting Defendants from continuing to submit false attestations and initiate Federal and State IDR Processes for claims, items, or services that are not eligible for IDR, or from seeking to enforce non-binding awards entered on items and services not eligible for IDR.

342.    There is no adequate remedy at law to prevent the ongoing harm caused by Defendants' conduct.

**PRAYER FOR RELIEF**

WHEREFORE, BCBSTX respectfully requests a judgment in its favor granting the following relief:

      a.    An award of compensatory damages in an amount to be proven at trial;

      b.    An award of punitive and exemplary damages;

      c.    Equitable and declaratory relief, as requested herein;

d.      Costs;

e.      Reasonable attorney fees;

f.      Prejudgment and post-judgment interest; and

g.      An award of any other relief in law or equity that the Court deems just and proper.

Dated: August 28, 2025

By: */s/ Geoffrey Culbertson*

**PATTON, TIDWELL & CULBERTSON**

Kelly B. Tidwell
Geoffrey P. Culbertson
2800 Texas Boulevard
PO Box 5398
Texarkana, TX 75505
Telephone: (903) 792-7080
Facsimile: (903) 792-8233
kbt@texarkanalaw.com
gpc@texarkanalaw.com

&

**ROBINS KAPLAN LLP**

Jamie R. Kurtz* (Lead Attorney)
JKurtz@RobinsKaplan.com
Nathaniel J. Moore*
NMoore@RobinsKaplan.com
Kyle D. Nelson*
KNelson@RobinsKaplan.com
Jackie Fielding*
JFielding@RobinsKaplan.com
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
P: 612.349.8500

*Application for *pro hac vice* admissions
forthcoming

*Attorneys for Plaintiff Blue Cross Blue Shield of
Texas*

