# EXHIBIT 1




November 22, 2021

HP-2021-24

# Evidence on Surprise Billing:
# Protecting Consumers with the No Surprises Act

New rules taking effect January 1, 2022, will extend consumer safeguards to millions, take patients out of payment disputes between payers and providers, and establish a process for settling those disputes.

## KEY POINTS

- On January 1, 2022, the surprise billing provisions of the Consolidated Appropriations Act, 2021 – commonly referred to as the No Surprises Act – will go into effect. These requirements address the problem of surprise billing, which occurs when a privately insured individual receives an unexpected balance bill either in an emergency situation or when a service in an in-network facility is provided by an out-of-network provider.
- Research over the past decade shows that surprise billing is relatively common among privately-insured patients. Studies show that, on average, 18 percent of emergency room visits by people with large employer coverage result in one or more out-of-network bills and nearly 20 percent of patients undergoing in-network elective surgeries or giving birth in a hospital received surprise bills. Surprise bills in these studies averaged more than $1,200 for anesthesia, $2,600 for surgical assistants, and $750 for childbirth. All told, more than half of U.S. consumers report having received an unexpectedly large bill.
- Key among the No Surprises Act's provisions is removing the patient from payment disputes between providers and payers in instances where surprise billing occurs and establishing how such disputes will be resolved. The law established the framework for a formal payment dispute resolution process that was set forth in an Interim Final Rule issued on October 7, 2021.
- State efforts regarding surprise billing dispute resolution indicate that some of the possible approaches may potentially lead to increased health care costs. This experience informed current federal rulemaking.

## INTRODUCTION

The No Surprises Act, signed into law on December 27, 2020 as part of the Consolidated Appropriations Act, 2021,[1] was designed to address the challenges of surprise billing. A surprise bill is an unexpected bill an individual receives for services provided by an out-of-network provider and occurs when a patient receives a bill for the difference between the provider's charges and what their insurance pays an out-of-network provider plus the patient's cost sharing, which is known as balance billing. These bills may be both unexpected to consumers and expensive. Surprise billing can happen in emergency situations, such as when a person goes to or is taken to the nearest emergency department that may or may not be in their issuer's provider network. However, surprise billing can also occur in non-emergency situations, such as when individuals receive care in

an in-network hospital without knowing that other providers critical to their needed care (such as ancillary providers like anesthesiologists or assistant surgeons) are not part of their insurer's network. The issue of surprise billing has primarily pertained to the private insurance market, since both Medicare and Medicaid have provisions addressing balance billing.

This issue brief reviews evidence on surprise billing and its burden on patients, explores policy approaches to address surprise billing including state actions, and describes new federal rules implementing the No Surprises Act.

## BACKGROUND

Surprise billing is a relatively common experience among the nearly 200 million Americans with private health insurance. For instance, a 2018 survey found that 57 percent of U.S. adults had received a medical bill that came as a surprise to them and that they thought would be covered by their insurance, though the survey did not distinguish whether these were out-of-network charges or resulted from other circumstances.[2]

In a 2017 national study, an estimated 18 percent of emergency room visits by individuals with large employer coverage resulted in one or more out-of-network bills. This percentage of emergency room visits with an out-of-network charge varied widely by state, with a high of 38 percent in Texas and a low of 3 percent in Minnesota (Figure 1).[3] The same study found emergency visits in urban areas (18 percent) are somewhat more likely to result in at least one out-of-network charge than are visits in rural areas (14 percent). Overall, patients receiving a surprise bill for emergency care paid physicians more than 10 times as much as emergency department patients without a surprise bill.[4]

**Figure 1: Share of emergency room visits with at least one out-of-network charge, among patients with large employer coverage, 2017**



**Note:** Gray shading indicates insufficient data
**Source:** Pollitz, Rae, Claxton, Cox and Levitt. An examination of surprise medical bills and proposals to protect consumers from them, Peterson-Kaiser Health System Tracker, February 10, 2020. Data (based on 2017 IBM MarketScan data) available here: https://www.healthsystemtracker.org/brief/an-examination-of-surprise-medical-bills-and-proposals-to-protect-consumers-from-them-3/

A 2020 study of privately-insured patients receiving elective surgery at an in-network hospital found that approximately 20 percent of patients received such a bill, often from an anesthesiologist (with an average out-of-network bill of $1,219) or surgical assistant (with an average out-of-network bill of $2,633).[5] A 2021 study of childbirth-related surprise billing found a similar percentage (18 percent) resulted in surprise bills (averaging $744), although for a third of families the surprise bill was over $2,000.[6]

Air ambulance service surprise bills are especially concerning because air ambulance services can be very expensive. A 2021 study found that in 2017, the average base price (not including mileage fees) charged by air ambulance providers was approximately $24,507 for a helicopter transport and $30,466 for a fixed-wing transport, and these charges have increased substantially in the past few years.[7] A report by the Government Accountability Office (GAO) using 2017 data found that 69 percent of air ambulance transports of privately insured patients were out-of-network.[8] Medicare beneficiaries are more likely to need an air ambulance transport, but a previous ASPE analysis showed that Medicare allowed charges[*] for air ambulance services were significantly lower than mean billed charges for commercial air ambulance claims in 2017.[9]

## STATE LEGISLATIVE APPROACHES

A majority of states have attempted to address surprise billing for the insurance plans they regulate. Researchers developed criteria for a comprehensive approach to surprise billing and have identified legislation in 18 states that fully meet those specifications, with an additional 15 states taking less comprehensive actions.[10] Figure 2 identifies these states with balance billing protections. States with comprehensive approaches address all of these items: they extend protections to both emergency department and in-network hospital settings; apply laws to all types of insurance, including both HMOs and PPOs; protect consumers by holding them harmless from extra provider charges; prohibit providers from balance billing; and adopt either an adequate payment standard to determine how much the insurer pays the provider or a dispute-resolution process to resolve payment disputes between providers and insurers.

How these states determine payment amounts in disputed cases varies. Some states have established a payment standard either through legislation or regulation; others have established a process for resolving disputed claims through an independent third party. Some states combine approaches. Seven states have established payment standards, with significant variation both across and within states.[†] They are typically derived from a fixed fee schedule, and options include the Medicare fee schedule, the plan's median contracted rate for a similar service, or information derived from publicly available data from multiple insurers such as a state's all-payer claims database.

Nine of the "comprehensive" states identified in Figure 2 have established varying independent dispute resolution processes. Six of the nine states use a "baseball-style" best and final offer process, where the arbiter chooses between two discrete offers – either choosing the provider's offer or the insurer's offer.[11] Some states use a combination of approaches, for example, by setting a payment standard when the claim in question is not large and authorizing arbitration for larger amounts.[12]

---

[*] Medicare allowed charges include the amounts paid by Medicare in addition to any coinsurance and deductibles. The billed charges for private insurers are likely in many cases higher than the paid rates, which cannot be observed in these data (MarketScan).

[†] For example, Colorado provides for higher payments to facilities operated by the Denver Health and Hospital Authority and Maryland has different requirements for HMOs and PPOs.

Figure 2: State Balance Billing Protections (as of February 5, 2021)



**Note:** Details on the criteria used to define "comprehensive protection" and "partial protection" are available here: https://www.commonwealthfund.org/sites/default/files/2019-01/Criteria_for_Meeting_Standards_v2.pdf.
**Source:** Hoadley, Kona, and Lucia, "States Can Prevent Surprise Bills for Patients Seeking Coronavirus Care," *To the Point* (blog), Commonwealth Fund, Apr. 29, 2020.

The impact of state surprise billing laws in many cases is unclear, in part because many have not been in place for long. However, New York's law has been in place since 2015 and has been closely scrutinized. New York uses a baseball-style arbitration, and its arbiters have received guidance to consider the 80th percentile of charges in determining the payment amount.‡ Since the amount providers charge is typically much higher than the actual negotiated rate, this approach risks leading to significantly higher overall costs, and this has been supported by the evidence to date. Through 2018, New York's approach had resulted in arbitration decisions that averaged 8 percent higher than the 80th percentile of charges and has the potential to alter negotiations between insurers and their network providers, leading to higher future consumer costs.[13] A peer reviewed study in 2021 of New Jersey's system, where billed charges or usual and customary rates are taken into consideration, also found it was associated with high payments – with a median arbitration award 5.7 times higher than median in-network commercial rates.[14,15]

Moreover, analysts have suggested that using benchmarks similar to those in New York and New Jersey can raise health care costs even outside the setting of surprise billing. This is because using a benchmark based on provider charges for out-of-network payment determinations can increase providers' leverage for negotiating higher in-network rates, since insurers will otherwise face the alternative of high out-of-network arbitration awards.[16]

State actions on surprise billing have other important limitations. First and foremost, roughly 67 percent of workers with employer-sponsored health coverage are enrolled in self-insured plans.[17] State insurance rules do not apply to self-insured employee benefit plans established or maintained by private sector employers, which are subject to federal oversight[18].

_____

‡ The 80th percentile among all providers' charges represents the amount a provider charges for a particular service that is higher than that charged by 80 percent of other providers for the same service.

Further, states have been unable to address the costs of air ambulance services because the Airline Deregulation Act of 1978 preempts state law and prevents states from regulating air ambulance costs. While states have tried to litigate the issue, they have not been successful.[19]

## THE NO SURPRISES ACT AND ITS IMPLEMENTATION

The No Surprises Act (the Act) and its implementing rules were designed to address these gaps in state policies and apply protections against surprise billing nationwide. The Act addresses surprise billing in both emergency and certain non-emergency contexts, as well as for air ambulance services. The Act generally prohibits out-of-network providers and facilities from balance billing for emergency services and requires that cost-sharing for such services (including copayments, coinsurance, and deductibles) not be greater than what would be charged on an in-network basis, and without requirements for prior authorization. In non-emergency situations where a facility providing care may be in-network but the care involves out-of-network providers, the Act allows balance billing by certain types of providers, if the patient has consented to being balance billed and has been provided with an easy-to-understand notice explaining this requirement with a good faith estimate of costs.

Thus, the Act will effectively remove the patient from payment disputes between health plans and out-of-network providers when the payment a provider wishes to receive is higher than the amount a plan is willing to pay. The Act provides an outline for an independent dispute resolution process for these circumstances but left many details of that process to rulemaking.

The Act and its implementing regulations provide for four ways to determine out-of-network payments in these disputed circumstances:
- Payment as established by an applicable All-Payer Model Agreement with the Centers for Medicare & Medicaid Services (CMS) to test and operate systems of all-payer payment reform;
- If there is no applicable All-Payer Model Agreement, the amount determined by an applicable state law (referred to as a specified state law);
- If there is no applicable All-Payer Model Agreement or applicable specified state law, an amount agreed upon by provider and payer; or
- If none of these apply, an amount determined by a certified independent dispute resolution (IDR) entity.

The Congressional Budget Office estimated that the provisions of the No Surprises Act, in most markets, would typically reduce premiums by between 0.5 percent and 1 percent. Lower costs for health insurance would also reduce federal deficits.[20]

In July, the Departments of Health and Human Services (HHS), Labor, and the Treasury (collectively, the Departments), along with the Office of Personnel Management, issued an interim final rule addressing the first three items listed above (the July rule).[21] The fourth – the amount determined by the IDR process – is described in the next section.

### Process for Resolving Disputed Claims

The Departments, along with the Office of Personnel Management, issued an Interim Final Rule with comment period published in the Federal Register October 7, 2021 (the October rule).[22] The October rule is designed to provide a process for resolving disputed claims that is fair to both providers and plans that also does not increase aggregate healthcare system costs. The provisions contained in the rule are applicable to plan or policy years beginning on or after January 1, 2022.

The Act as implemented by the October rule establishes the independent process for resolving disputed claims. The process relies on IDR entities, which CMS is in the process of certifying.[§]

Below are the steps involved in resolving a disputed claim:
- Prior to initiating an IDR process, disputing parties must attempt, over a period of 30 business days, to reach agreement on the payment amount.
- If this attempt fails, ether party can invoke the federal IDR process. The parties jointly select a certified IDR entity without conflicts of interest to resolve the dispute, or if they don't make a choice, the Departments select the certified IDR entity. The parties submit their offers for payment along with supporting documentation. The IDR entity then issues a binding determination selecting one of the parties' offers as the payment amount.
- The certified IDR entity must select the offer closest to the qualifying payment amount (QPA) unless the certified IDR entity determines that credible information submitted by either party as defined by the Act clearly demonstrates that the QPA is materially different from the appropriate out-of-network rate, or if the offers are equally distant from the QPA but in opposing directions. In these cases, the certified IDR entity must select the offer as the out-of-network rate that the certified IDR entity determines best represents the value of the qualified IDR item or services. The QPA is generally an amount based on indexed median contracted rates, but the Act and the July rule provide for alternate methods of determining the QPA in some circumstances, such as when the payer has insufficient information to calculate the median contracted rates.[**]

## Unanswered Questions and Reporting Requirements

The July rule identifies questions about the impact of these surprise billing provisions that will only be answered over time. We do not know how often the IDR process will be used and whether its usage will vary based on the size of the insurer or on other characteristics. It is not clear whether the 30-business-day pre-IDR negotiation period will lead to disputes being resolved sooner. The Act and regulation allow for the batching of similar claims, but whether this happens and its potential impact remains to be seen. Future evaluation will be needed to assess the impact of these provisions on the costs of emergency and non-emergency services. The No Surprises Act itself includes provisions that will assist in answering these questions.

The Act includes monthly reporting requirements for certified IDR entities.[23] These requirements will elucidate the nature of each claim that undergoes the IDR process, provider characteristics, how the claim is resolved, and whether a payment exceeds the QPA, among other aspects of disputed claims. This reporting will provide timely information on how the process is working. The Act also includes requirements for regular reporting related to air ambulance services. In addition, the Act requires several related reports to Congress, some by HHS in consultation with the Federal Trade Commission and the Attorney General, and others by the GAO. The first of the reports produced by HHS in consultation with the Federal Trade Commission and the Attorney General is due on January 1, 2023, and annually thereafter for four years. These reports will cover the effects of the Act with particular attention paid to patterns of vertical or horizontal integration, overall health care costs, and access to health care services, particularly in rural areas and health professional shortage areas. The GAO reports will examine the effects of the Act on health care provider networks, group and individual

_____

[§] Applications are being accepted, to be certified by January 1, 2022. The application process will remain open to accept applications on a rolling basis: https://www.cms.gov/nosurprises/Help-resolve-payment-disputes.

[**] The Act and the July rule provide for alternate ways for determining the QPA in instances where a plan or issuer has insufficient information to calculate a median contracted rate for an item or service. Consolidated Appropriation Act, 2021. https://www.congress.gov/116/bills/hr133/BILLS-116hr133enr.pdf, as implemented by Requirements Related to Surprise Billing, Part I, Federal Register, July 13, 2021  https://www.federalregister.gov/documents/2021/07/13/2021-14379/requirements-related-to-surprise-billing-part-i.

insurance coverage, fee schedules and amounts paid for health care services, the adequacy of provider networks in commercial health plans, and the IDR process.[24]

## CONCLUSIONS

The No Surprises Act addresses a significant burden faced by millions of U.S. consumers. State legislation has only been partially able to address these challenges, and in some cases, state approaches to settling payment disputes has led to increased health care costs. The approach taken in the 2021 Interim Final Rules under the No Surprises Act is designed to create a fair process that is expected to lower overall health care costs. The Act, through its multiple reporting requirements, will provide the evidence needed to evaluate the law's performance over time to inform any future policy changes that may be warranted in this area.

## REFERENCES

[1] H.R. 133 – Consolidated Appropriations Act, 2021. The No Surprises Act is found at Division BB. https://www.congress.gov/bill/116th-congress/house-bill/133/text

[2] NORC. NORC AmeriSpeak Omnibus Survey: Surprise Medical Bills. August 16-20, 2018. https://www.norc.org/PDFs/Health%20Care%20Surveys/Surprise%20Bills%20Survey%20August%202018%20Topline.pdf

[3] Pollitz, K, Rae, M, Claxton, G, Cox, C and Levitt, L. An examination of surprise medical bills and proposals to protect consumers from them, Peterson-Kaiser Health System Tracker, February 10, 2020. https://www.healthsystemtracker.org/brief/an-examination-of-surprise-medical-bills-and-proposals-to-protect-consumers-from-them

[4] Biener, AI, Chartock, BL, Garmon, C and Tish, E. Emergency Physicians Recover a Higher Share of Charges from Out-of-Network Care than from In-Network Care. *Health Affairs*. 2021;40(4).

[5] Chhabra, K, Sheetz, K, Ushapoorna, N, et al., Out-of-Network Bills for Privately Insured Patients Undergoing Elective Surgery with In-Network Primary Surgeons and Facilities, JAMA. 2020;323(6):538-547.

[6] Chua K, Fendrick AM, Conti RM, Moniz MH. Prevalence and Magnitude of Potential Surprise Bills for Childbirth. *JAMA Health Forum.* 2021;2(7):e211460.

[7] FAIR Health. Air Ambulance Services in the United States: A Study of Private and Medicare Claims. *White paper*. September 28, 2021.

[8] U.S. Government Accountability Office, AIR AMBULANCE: Available Data Show Privately-Insured Patients Are at Financial Risk, GAO-19-292: Published: Mar 20, 2019, https://www.gao.gov/products/gao-19-292. State efforts to address air ambulance prices have been unsuccessful in court.

[9] Turrini, G, Ruhter, J, Chappel, AR, and De Lew, N. Air Ambulance Use and Surprise Billing (Issue Brief No. HP-2021-20). Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services. September 2021. https://aspe.hhs.gov/sites/default/files/2021-09/aspe-air-ambulance-ib-09-10-2021.pdf

[10] Kona, M. State Balance-Billing Protections. *The Commonwealth Fund.* February 5, 2021. https://www.commonwealthfund.org/publications/maps-and-interactives/2021/feb/state-balance-billing-protections?redirect_source=/publications/maps-and-interactives/2019/jul/state-balance-billing-protections

[11] Hoadley, J, Kona, M. How States Are Using Independent Dispute Resolution to Resolve Out-of-Network Payments in Surprise Billing, February 27, 2020, https://www.commonwealthfund.org/blog/2020/how-states-are-using-independent-dispute-resolution-resolve-out-network-payments-surprise

[12] Hoadley, J, Lucia, K. Hybrid Approach to Resolving Payment Disputes Breaks Legislative Stalemates Over Balance Billing, How Will the No Surprises Act Affect These New State Laws? April 16, 2021 Georgetown University Health Policy Institute, Center for Children and Families. https://ccf.georgetown.edu/2021/04/16/hybrid-approach-to-resolving-payment-disputes-breaks-legislative-stalemates-over-balance-billing-how-will-the-no-surprises-act-affect-these-new-state-laws/

[13] Adler, L, Experience with New York's arbitration process for surprise out-of-network bills, USC-Brookings Schaeffer on Health Policy, October 24, 2019. https://www.brookings.edu/blog/usc-brookings-schaeffer-on-health-policy/2019/10/24/experience-with-new-yorks-arbitration-process-for-surprise-out-of-network-bills/

[14] Chartock, BL, Adler, L, Ly, B, Duffy, E, and Trish, E. Arbitration over Out-of-Network Medical Bills: Evidence from New Jersey Payment Disputes. *Health Affairs*. January 2021. https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2020.00217

[15] Fielder, M, Adler, L, Ippolito, B. Recommendations for Implementing the No Surprises Act. USC-Brookings Schaeffer on Health Policy, March 2021. https://www.brookings.edu/blog/usc-brookings-schaeffer-on-health-policy/2021/03/16/recommendations-for-implementing-the-no-surprises-act/

[16] Congressional Budget Office Cost Estimate. "H.R. 2328, Reauthorizing and Extending America's Community Health Act." (September 2019). https://www.cbo.gov/system/files/2019-09/hr2328.pdf.

[17] Kaiser Family Foundation, 2020 Employer Health Benefits Survey. October 8, 2020. https://www.kff.org/report-section/ehbs-2020-section-10-plan-funding/

[18] Adler, L. Experience with New York's Arbitration Process for Surprise Out-of-Network Bills. *USC-Brookings Schaeffer Initiative for Health Policy.* October 24, 2019. https://www.brookings.edu/blog/usc-brookings-schaeffer-on-health-policy/2019/10/24/experience-with-new-yorks-arbitration-process-for-surprise-out-of-network-bills/

[19] National Association of Insurance Commissioners, Air Ambulance Regulation, May 27, 2021, https://content.naic.org/cipr_topics/topic_air_ambulances.htm

[20] Congressional Budget Office, Estimate for Divisions O Through FF H.R. 133, Consolidated Appropriations Act, 2021 Public Law 116-260 Enacted on December 27, 2020, January 14, 2021, https://www.cbo.gov/system/files/2021-01/PL_116-260_div%20O-FF.pdf

[21] Consolidated Appropriation Act, 2021. https://www.congress.gov/116/bills/hr133/BILLS-116hr133enr.pdf, as implemented by Requirements Related to Surprise Billing, Part I, Federal Register, July 13, 2021 https://www.federalregister.gov/documents/2021/07/13/2021-14379/requirements-related-to-surprise-billing-part-i

[22] Requirements Related to Surprise Billing: A Rule by the Personnel Management Office, the Internal Revenue Service, the Employee Benefits Security Administration, and the Health and Human Services Department on 10/07/21. https://www.federalregister.gov/documents/2021/10/07/2021-21441/requirements-related-to-surprise-billing-part-ii

[23] Sections 2799A-1(c)(7) of the Public Health Service Act; 716(c)(7) of ERISA; and 9816(c)(7) of the Internal Revenue Code. See discussion in "Requirements Related to Surprise Billing; Part II Interim Final Rule with Comment Period: Fact Sheet. September 30, 2021". https://www.cms.gov/newsroom/fact-sheets/requirements-related-surprise-billing-part-ii-interim-final-rule-comment-period

[24] Consolidated Appropriation Act, 2021. https://www.congress.gov/116/bills/hr133/BILLS-116hr133enr.pdf

HP-2021-24

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Office of the Assistant Secretary for Planning and Evaluation**

200 Independence Avenue SW, Mailstop 447D
Washington, D.C. 20201


For more ASPE briefs and other publications, visit:
aspe.hhs.gov/reports



**SUGGESTED CITATION**
Evidence on Surprise Billing: Protecting Consumers with the No Surprises Act (Issue Brief No. HP-2021-24). Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services. November 2021.

**COPYRIGHT INFORMATION**
All material appearing in this report is in the public domain and may be reproduced or copied without permission; citation as to source, however, is appreciated.

**DISCLOSURE**
This communication was printed, published, or produced and disseminated at U.S. taxpayer expense.
_____

Subscribe to ASPE mailing list to receive
email updates on new publications:
https://list.nih.gov/cgi-bin/wa.exe?SUBED1=ASPE-HEALTH-POLICY&A=1

For general questions or general
information about ASPE:
aspe.hhs.gov/about